**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**JOHN DOE, M.D.,**[1] )
)
*Plaintiff,* )
)
v. ) Civil Action No. 3:26-cv-1340
)
**DAVID E. BROWN, D.C.,** in his official capacity as Director of the Virginia Department of Health Professions, and his successors in office; ) **JURY TRIAL DEMANDED**

**WILLIAM L. HARP, M.D.,** in his official capacity as Executive Director of the Virginia Board of Medicine, and his successors in office, and in his individual capacity;

**ARNE W. OWENS,** in his individual capacity;

**JENNIFER L. DESCHENES, J.D., M.S.,** in her individual capacity;

**L. BLANTON MARCHESE,** in his individual capacity;

**JOHN R. CLEMENTS, D.P.M.,** in his individual capacity;

**KAMLESH DAVE, M.D.,** in his individual capacity;

**PETER J. APEL, M.D.,** in his individual capacity;

**LEROY B. VAUGHAN, JR., M.D.,** in his individual capacity;

**KAREN A. RANSONE, M.D.,** in her individual capacity;

**JENNIFER RATHMANN, D.C.,** in her

[1] This Complaint is filed pseudonymously. Plaintiff will move the Court for leave to proceed under pseudonym and to seal any exhibits, presently or subsequently, that would reveal his identity, pursuant to Federal Rule of Civil Procedure 5.2 and the Court's inherent authority.

| | |
|---|---|
| individual capacity;<br><br>**VIRGINIA DEPARTMENT OF HEALTH PROFESSIONS;**<br><br>**VIRGINIA BOARD OF MEDICINE;**<br><br>**JOHN DOES 1–50,** in their individual capacities;<br><br>*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

---

**COMPLAINT FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND DAMAGES**

***(42 U.S.C. § 1983; TITLE II OF THE AMERICANS WITH DISABILITIES ACT; SECTION 504 OF THE REHABILITATION ACT; 28 U.S.C. §§ 2201–2202)***

COMES NOW the Plaintiff, John Doe, M.D., by counsel, and for his Complaint against the Defendants states as follows:

## INTRODUCTION

1. For more than nineteen years, the Commonwealth of Virginia has suspended Dr. Doe's license to practice medicine on the basis of a falsity and by the unconstitutional application of a Virginia statute that has denied him Due Process.

2. Virginia Code § 54.1-2409(A) commands the immediate suspension of a physician's license without a hearing upon documentation that he "has … been convicted of a felony."

3. Dr. Doe was never convicted of a felony.

4. Instead, in 2004, he was charged with a felony in Colorado and that charge was dismissed without a conviction.[2]

5. His conditional guilty plea to that felony charge in Colorado was withdrawn and that charge was dismissed upon his early and successful completion of a statutory diversion program

[2] Dr. Doe was charged with "menacing with a weapon" which is merely a misdemeanor in Virginia.

forty-one days before his medical license was unlawfully suspended in 2007, without notice or hearing, due to a misreading of a Colorado court order by the then Director of the Virginia Department of Health Professions.

6. No agency, court or tribunal has ever decided, or even taken evidence of, the question that lies at the center of this case, which is whether Dr. Doe was in fact convicted of a felony. He has been denied any opportunity to do so since 2007.

7. After the unlawful suspension of his medical license, the Virginia Board of Medicine, instead of simply exonerating Dr. Doe as it is empowered to do, forced him to petition for reinstatement of his license, as though he were an actual felon. The Board mandated this injustice even though its own investigator had conclusively ascertained that Dr. Doe had not been convicted of a felony.

8. The Board specifically barred Dr. Doe from challenging the mistaken suspension of his license during subsequent reinstatement proceedings and in disciplinary action that resulted from Dr. Doe's inability to comply with the Board's onerous reinstatement conditions.

9. When the conditions of reinstatement proved impossible to meet, Dr. Doe sought relief in the courts by several means: (i) judicial review of the Board's reinstatement orders; (ii) federal action for declaratory relief and damages in this Court; and (iii) a petition for mandamus and prohibition to the Supreme Court of Virginia challenging the subject matter jurisdiction of the Director of the Virginia Department of Health Professions to suspend a license by mistake.

10. Most recently, Dr. Doe sought declaratory judgment in the Virginia courts to declare the suspension orders to be void ab initio for lack of due process and the courts dismissed his claim on procedural grounds without addressing the merits of the claim and without affording Dr. Doe a hearing or the opportunity to present evidence.

11. To date, all of the courts have disposed of Dr. Doe's challenges by consideration of nearly everything but the utter lack of due process that led to the unlawful and mistaken suspension of his medical license, including statutes of limitations, the doctrine of sovereign immunity and writ standards. The dismissals of these actions have come in the form of unpublished opinions and summary orders.

12. Indeed, to this day, no agency, board or court has afforded Dr. Doe the ability to present evidence that he was never a felon and to challenge the basis of the suspension of his medical license; the very essence of his fundamental right of due process to protect the property and liberty interest in his medical license.

13. The wrongs against Dr. Doe are ongoing and, in fact, many of the claims in this Complaint arise from the Defendants' conduct of 2019 through 2026, which no court has reviewed.

14. The initial mistaken conclusion by the Director of the Virginia Department of Health Professions in 2007 that Dr. Doe had been convicted of a felony may possibly have been negligent, but the subsequent actions of the Defendants have been willful and malicious.

15. The Department knew the difference in 2007 between a conviction and a guilty plea that never became one, because it drew that line in the same weeks it crossed it. Six days before Dr. Doe's suspension, the same Director suspended another physician under the same statute, a physician who had actually been adjudicated guilty of a felony and sentenced, and made the subject of a Judgment in a Criminal Case, which the Director recited and attached to her order. See ¶ 204 below.

16. In contrast to the order mentioned above, while reciting the identical language in her order of suspension of Dr. Doe's medical license, the Director attached no such judgment to the order, because no such judgment has ever existed.

17. The contrast is not abstract. The Virginia Board of Medicine restored the licenses of other physicians that were suspended under this very statute: one with a felony guilty plea and

admitted impairment, heard and reinstated in under a year; another whose basis for suspension had ceased to exist was heard and reinstated in roughly two months; another restored to full and unrestricted status by consent nineteen (19) **days** after the suspension entered, and within a week of the cure of the basis for the suspension. Dr. Doe, whose conviction never existed at all, repeatedly asked the Board to act (in 2007, 2011, 2013, 2022, and twice in 2024), and has waited over nineteen (19) **years** and counting, still suspended, still branded a felon and an impaired physician in records the Board knows to be false.

18. The Board of Medicine is empowered to convene a special conference committee and hold a proceeding that could correct the record and restore Dr. Doe's license, and for nineteen years and counting it has refused to do so, refusing to render a case decision, to exonerate, or even to respond to those petitions. Each day the Board declines to act, and each time the Defendants republish the felony and impairment characterizations they know to be false, most recently in a judicial opinion that stripped Dr. Doe's pseudonym in October 2025 and its republication weeks later in November 2025, the deprivation is not merely continued but renewed.

19. The Defendants have conceded in pleading to the Court of Appeals of Virginia the truth that the 2007 suspension was not appealable and that it was not a "case decision" as contemplated by the Virginia Administrative Process Act, leaving no order or record for any court to review; thus no court could possibly have reached the merits of the basis for the suspension of Dr. Doe's medical license.

20. Dr. Doe brings this action to end a deprivation the Defendants alone have the power to end and alone refuse to end. He seeks a declaration that the 2007 order and everything derived from it are void *ab initio*; an order correcting the records, reports, and publications that perpetuate the void order's effect and according full faith and credit to the judgments of the

Colorado court that dismissed and sealed the underlying matter; and damages for the destruction of his profession, his property, his standing, and his relationships with his children over nineteen years. He asks this Court to grant that relief directly, rather than return him to the body whose nineteen-year refusal created and sustained the wrong.

**JURISDICTION AND VENUE**

21. This action arises under the Constitution and laws of the United States, including the Fourteenth Amendment; 42 U.S.C. § 1983; Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq.; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

22. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) and (4) (deprivation, under color of state law, of rights secured by the Constitution and federal civil-rights statutes). The Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202, and injunctive relief under 28 U.S.C. § 1343 and Federal Rule of Civil Procedure 65.

23. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Dr. Doe's claims arising under the Constitution and laws of Virginia, including the self-executing Due Process Clause of Article I, § 11 of the Constitution of Virginia, because those claims form part of the same case or controversy as the federal claims. Those state-constitutional claims are pleaded as parallel to and supportive of the federal claims, not as an independent basis for relief; every form of relief Dr. Doe seeks is independently grounded in federal law and, as to the official-capacity Defendants, in *Ex parte Young*. To the extent any claim requires the Court to determine, as a matter of Virginia law, that the 2007 order was entered without statutory authority, that determination is antecedent to and in aid of Dr. Doe's federal claims, the continued enforcement of the order being the ongoing violation of federal law

from which relief is sought, and is not a request that this Court order the Defendants to conform their conduct to state law.

24. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2). The Defendants reside in this District, and a substantial part of the events and omissions giving rise to the claims (including the entry, maintenance, and continued enforcement of the suspension, the publication of the challenged characterizations, and the Defendants' continuing refusal to convene the committee and hold the corrective proceeding) occurred in this District. Assignment to the Richmond Division is proper because the Department of Health Professions and the Board of Medicine maintain their offices, records, and operations in this Division, and the official acts and omissions at issue occurred here.

25. The Eleventh Amendment does not bar this action. The official-capacity claims seek prospective relief against state officers to end an ongoing violation of federal law and are permitted under *Ex parte Young*, 209 U.S. 123 (1908). The claims against the Department and the Board under Title II of the ADA proceed to the extent Congress validly abrogated sovereign immunity for conduct that independently violates the Fourteenth Amendment, see *United States v. Georgia*, 546 U.S. 151 (2006), and the claims under Section 504 proceed because the Department and the Board waived sovereign immunity by accepting federal financial assistance, see 42 U.S.C. § 2000d-7. The claims for damages are asserted against the individual Defendants in their individual capacities. The *Ex parte Young* inquiry is a "straightforward" one: whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective. *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). This Complaint alleges both: the continued enforcement of the suspension and of the characterizations derived from it violates the Fourteenth Amendment, the ADA, and the Rehabilitation Act, as pleaded in Counts I

through IX, and the relief sought against the official-capacity Defendants is prospective and corrective.

26. This action is not barred by the *Rooker-Feldman* doctrine, which is confined to cases brought by state-court losers seeking what is in substance appellate review of a state-court judgment. See *Exxon Mobil Corp. v. Saudi Basic Industries Corp*., 544 U.S. 280, 284 (2005). Dr. Doe does not seek review or reversal of any state-court judgment. He challenges the validity of executive orders of the Department and the Board, the April 26, 2007 suspension and the orders, directives, reports, and actions derived from it, and seeks prospective relief against their continued enforcement. No state court has adjudicated the merits of the federal claims asserted here: whether a felony conviction existed, whether the post-deprivation process afforded and withheld from 2008 to the present satisfies the Fourteenth Amendment, or whether the Defendants' conduct since 2019 violates federal law. The state proceedings were resolved on limitations, sovereign immunity, and the Commonwealth's characterization of the suspension as a non-appealable, non-case-decision act, and the one procedural argument the Court of Appeals reached in 2025, whether a hearing was required before the 2007 suspension, is not a claim asserted here. To the extent Dr. Doe references state-court rulings, he does so only to show that those rulings disposed of his claims on threshold grounds (limitations, immunity), and the Commonwealth's characterization of the suspension, without reaching, on the merits, the validity of the 2007 order or the lawfulness of the Defendants' continuing conduct.

27. No pending state proceeding requires or permits abstention under *Younger v. Harris*, 401 U.S. 37 (1971), which applies only to the limited categories of ongoing state criminal prosecutions, certain civil enforcement proceedings, and civil proceedings involving orders uniquely in furtherance of the state courts' judicial function. See *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 78 (2013). The administrative and state-court proceedings

concerning Dr. Doe's license have concluded; the Supreme Court of Virginia denied review on June 19, 2026. A protective action Dr. Doe filed in the Circuit Court of Henrico County on February 11, 2025, but never served, and a voluntarynonsuit is pending. There is, accordingly, no ongoing state judicial proceeding with which this action could interfere. Nor is abstention warranted under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). Dr. Doe asserts federal constitutional and statutory claims; on the Commonwealth's own repeated representations, Virginia affords no avenue of administrative appeal or judicial review of a § 54.1-2409 suspension, so there is no unified state review scheme with which this action could interfere; and the relief sought would not disrupt any coherent state regulatory policy, but would remedy the Defendants' own departure from the scheme the Commonwealth describes.

28. Neither claim nor issue preclusion bars this action. Dr. Doe's earlier federal action was dismissed on limitations grounds, and the claims asserted here are not the claims asserted there: they arise from conduct that had not yet occurred when that judgment entered, including the Colorado court's October 9, 2019 sealing order and the Defendants' continuing refusal to honor it; Dr. Doe's petitions of May 12, 2022, February 7, 2024, and June 7, 2024, and the Board's refusal to convene, to hear, or to decide any of them; the Board's failure to hold the hearing mandated by Virginia Code § 54.1-2409(D) at its September 13, 2024 meeting and at every meeting and hearing date since; and the Defendants' renewed publications of 2024 through 2026.

29. A judgment cannot preclude claims arising from conduct that postdates it, and no court has ever decided whether the Defendants' post-judgment refusals, renewals, and publications violate the Fourteenth Amendment, Title II of the Americans with Disabilities Act, or Section 504 of the Rehabilitation Act.

30. The state proceedings likewise preclude nothing asserted here. The 2017 and 2018 rulings on the appeal of the 2013 order were rendered in a proceeding the Commonwealth insisted was confined to compliance with the 2011 order, on a record from which the Board's own in limine ruling had excluded every document bearing on the felony predicate. The 2023 mandamus disposition held only that Dr. Doe "has not demonstrated" the Director lacked jurisdiction, under the heightened showing an extraordinary writ requires, in an original-jurisdiction posture without discovery.

31. The 2024 declaratory action was dismissed on the Defendants' plea in bar, on sovereign immunity and on the five-year limitations period of Virginia Code § 8.01-243(B) governing actions for injury to property, and the Court of Appeals affirmed on that limitations ground alone, stating in its opinion that the legal sufficiency of Dr. Doe's claims was not before it and that it analyzed voidness only to determine timeliness. None of the Board-member Defendants, and neither Brown nor Owens, was a party to that action in an individual capacity. It decided the timeliness of a state-law declaratory claim under a five-year property-damage period, not the timeliness of federal claims under the periods and accrual rules that govern them here. And it was entered on August 19, 2024, before the Board's September 13, 2024 default, before every convening at which the Board has since renewed its refusal, and before the publications of 2025 and 2026 on which the claims here rest.

32. As the Commonwealth has itself repeatedly maintained and the Department's own uniform practice confirms, a § 54.1-2409 suspension is not an appealable case decision. No appealable judgment on the merits of the suspension has ever existed, and no tribunal, state or federal, has ever taken evidence on and decided whether Dr. Doe was convicted of a felony.

33. A judgment void *ab initio*, moreover, is a nullity that may be challenged at any time and in any proceeding in which its validity is at issue, and is incapable of acquiring preclusive

effect. To the extent the Defendants obtained any prior ruling, they did so on contradictory representations, and on records from which their own *in limine* bars had excluded the dispositive evidence, and a court should not permit them to rely on rulings so procured. See *New Hampshire v. Maine*, 532 U.S. 742, 749–51 (2001); *Lowery v. Stovall*, 92 F.3d 219, 223–24 (4th Cir. 1996).

## PARTIES

### I. THE PLAINTIFF

34. Plaintiff John Doe, M.D. ("Dr. Doe") is a physician and a licensed attorney. He proceeds pseudonymously to protect his identity and the sealed records underlying this action, and will move the Court for leave to proceed under pseudonym and to seal the exhibits that would reveal his identity. At all times relevant, Dr. Doe held a license to practice medicine in the Commonwealth of Virginia until its suspension on April 26, 2007.

### II. OFFICIAL-CAPACITY DEFENDANTS

35. Defendant David E. Brown, D.C., is the Director of the Virginia Department of Health Professions, sued in his official capacity and in the capacity of his successors in office. The Director administers the Department, is the officer whose office enters orders of the class at issue, and holds the authority over the Department's records and reports necessary to the prospective relief sought. The Department's official address is 9960 Mayland Drive, Suite 300, Henrico, Virginia 23233.

36. Defendant William L. Harp, M.D., is the Executive Director of the Virginia Board of Medicine, sued in his official capacity and in the capacity of his successors in office. The Executive Director administers the Board, which alone may convene the special conference committee and hold the proceeding necessary to correct the void suspension, and holds the authority over the Board's records and reports necessary to the prospective relief sought. The Board's official address is 9960 Mayland Drive, Suite 300, Henrico, Virginia 23233.

## III. INDIVIDUAL-CAPACITY DEFENDANTS

37. Defendant William L. Harp, M.D., is also sued in his individual capacity for his own conduct, including authorizing and maintaining the characterizations of Dr. Doe as a convicted felon and an impaired physician, issuing communications inconsistent with the Board's treatment of Dr. Doe, and participating in the Board's continuing refusal to convene the committee and hold the proceeding that would correct the void suspension.

38. Defendant Arne W. Owens is the former Director of the Virginia Department of Health Professions, sued in his individual capacity. During his tenure, which continued until approximately January 2026, Owens maintained the void suspension, failed and refused to correct the ministerial act that lacked any statutory predicate, and is responsible for the misrepresentations and refusals to correct alleged herein.

39. During Owens's tenure, Dr. Doe's petitions of May 12, 2022 and February 7, 2024, seeking exoneration and correction, and his application of June 7, 2024, seeking reinstatement, were received by the Department and the Board and were refused or ignored.

40. During Owens's tenure, Dr. Doe named the Director of the Department as a respondent in the 2023 mandamus proceeding in the Supreme Court of Virginia and as a defendant in the 2024 declaratory action in the Circuit Court of Campbell County, placing the Colorado judgments and the Board's own investigative record before him.

41. In each of those proceedings the Department, under Owens's direction, defended the suspension on a felony predicate its own records refuted and republished that predicate in filings of April 23, 2024, September 6, 2024, and February 3, 2025.

42. Throughout Owens's tenure the Department maintained the June 2015 Data Bank report without correction after the October 9, 2019 sealing order and the Colorado dismissal were placed before it.

43. Defendant Jennifer L. Deschenes, J.D., M.S., sued in her individual capacity, is the Deputy Executive Director (Discipline) of the Virginia Board of Medicine, and served as Acting Executive Director of the Board during a period in 2024, in the Executive Director's absence, exercising the authority of that office while Dr. Doe's 2024 petitions were pending and unanswered. Deschenes has been the principal signatory adverse to Dr. Doe on behalf of the Board, authored the letters denying Dr. Doe's 2022 and 2024 petitions and demanding a reinstatement application the Board's own counsel had conceded was unnecessary, and continues to exercise disciplinary authority for the Board to the present, including entering Board consent orders as recently as June 14, 2026.

44. Defendant L. Blanton Marchese is a member of the Virginia Board of Medicine, sued in his individual capacity. Marchese has served on the Board since 2019 and continues to serve, his current term extending to 2029. He was President of the Board during 2021 and 2022 (its presiding officer with authority over the matters brought before it), when Dr. Doe filed his May 12, 2022 petition asking the Board to convene the special conference committee and hold the proceeding that alone could correct the void suspension. He served on the Board's Executive Committee (the body that sets the Board's agenda and determines the matters brought before it) while Dr. Doe's 2022 and February 2024 petitions were pending and unanswered. Marchese did not cause that committee to be convened or that proceeding to be held, and did not cause the matter to be placed before the Board for decision. He remained on the Board through the pendency of Dr. Doe's 2024 petitions, and at the Board's September 13, 2024 regular meeting, at which the hearing mandated by Virginia Code § 54.1-2409(D) on Dr. Doe's June 7, 2024 petition was due and was not held, a non-discretionary duty each member then serving personally owed and did not discharge, and at each regular meeting and special conference committee the Board has convened since. With actual notice, through the Board's institutional records and the petitions lodged with the

Board during that service, that no felony conviction existed, he participated in or, having the authority and the duty to convene the special conference committee, to hold the proceeding, and to vote to do so, acquiesced in the Board's continuing refusal to do so.

45. Defendant Peter J. Apel, M.D., is a member of the Virginia Board of Medicine, sued in his individual capacity. Apel has served on the Board as its Vice-President and continues to serve. He was personally present and sat as a member of the panel of the Board convened on September 13, 2024, the Board's regular meeting next following the expiration of sixty days from Dr. Doe's June 7, 2024 reinstatement petition, at which the hearing mandated by Virginia Code § 54.1-2409(D) was due and was not held. At that meeting the panel on which Apel sat considered and, by unanimous vote, approved the reinstatement of the licenses of other physicians, while affording Dr. Doe no hearing, no proceeding, and no decision. That hearing was a non-discretionary duty each member then serving personally owed, and it was not provided. Apel participated in, or, having the authority and the duty to convene the special conference committee, to hold the proceeding, and to vote to do so, acquiesced in the Board's continuing refusal to do so at that meeting and at each regular meeting and special conference committee the Board has convened since, with actual notice, through the Board's institutional records and the petitions lodged with the Board during that service, that no felony conviction existed.

46. Defendant Leroy B. Vaughan, Jr., M.D., is a member of the Virginia Board of Medicine, sued in his individual capacity. Vaughan has served on the Board and continues to serve. He was personally present and sat as a member of the panel of the Board convened on September 13, 2024, the Board's regular meeting next following the expiration of sixty days from Dr. Doe's June 7, 2024 reinstatement petition, at which the hearing mandated by Virginia Code § 54.1-2409(D) was due and was not held. At that meeting the panel on which Vaughan sat considered and, by unanimous vote, approved the reinstatement of the

licenses of other physicians, while affording Dr. Doe no hearing, no proceeding, and no decision. That hearing was a non-discretionary duty each member then serving personally owed, and it was not provided. Vaughan participated in, or, having the authority and the duty to convene the special conference committee, to hold the proceeding, and to vote to do so, acquiesced in the Board's continuing refusal to do so at that meeting and at each regular meeting and special conference committee the Board has convened since, with actual notice, through the Board's institutional records and the petitions lodged with the Board during that service, that no felony conviction existed.

47. Defendant Jennifer Rathmann, D.C., is a member of the Virginia Board of Medicine, sued in her individual capacity. Rathmann has served on the Board continuously since 2021, through the pendency of Dr. Doe's May 12, 2022 petition, through his 2024 petitions, and at the Board's September 13, 2024 regular meeting, at which the hearing mandated by Virginia Code § 54.1-2409(D) on Dr. Doe's June 7, 2024 petition was due and was not held, a non-discretionary duty each member then serving personally owed and did not discharge, and continues to serve, her current term extending to 2029. She served on the Board's Executive Committee, the body that sets the Board's agenda and determines the matters brought before it, while Dr. Doe's 2022 and February 2024 petitions were pending and unanswered. Across that period she was repeatedly presented, through the matters before the Board, with Dr. Doe's requests that the Board convene the special conference committee and hold the proceeding that alone could correct the void suspension, and at each she participated in or, having the authority and the duty to convene the special conference committee, to hold the proceeding, and to vote to do so, acquiesced in the Board's continuing refusal to do so, with actual notice, through the Board's institutional records and the petitions lodged with the Board during that service, that no felony conviction existed.

48. Defendant John R. Clements, D.P.M., is a member of the Virginia Board of Medicine, sued in his individual capacity. Clements has served on the Board across multiple terms and continues to serve. He was President of the Board during 2023 and 2024, its presiding officer, with authority over the matters brought before it, when Dr. Doe filed his February 7, 2024 and June 7, 2024 petitions asking the Board to convene the special conference committee and hold the proceeding that alone could correct the void suspension, and when the Board held its September 13, 2024 regular meeting, at which the hearing mandated by Virginia Code § 54.1-2409(D) on the June 7, 2024 petition was due and was not held, a non-discretionary duty each member then serving personally owed and did not discharge. Clements did not cause that committee to be convened or that proceeding to be held, and did not cause the matter to be placed before the Board for decision, and the Board has held no hearing on the petition then or since. As President he chaired the Board's Executive Committee, the body that sets the Board's agenda and determines the matters brought before it, while Dr. Doe's 2022 and February 2024 petitions were pending and unanswered. With actual notice, through the Board's institutional records and the petitions lodged with the Board during that service, that no felony conviction existed, he participated in or, having the authority and the duty to convene the special conference committee, to hold the proceeding, and to vote to do so, acquiesced in the Board's continuing refusal to do so.

49. Defendant Kamlesh Dave, M.D., is a member of the Virginia Board of Medicine, sued in his individual capacity. Dr. Dave's current term began July 1, 2024 and continues to the present. In that capacity he has participated in, or (having the authority and the duty to act) acquiesced in the Board's continuing refusal to convene the special conference committee and hold the proceeding that would correct the void suspension, including at the Board's September 13, 2024 regular meeting, at which the hearing mandated by Virginia Code § 54.1-2409(D) on Dr. Doe's June 7, 2024 petition was due and was not held, a non-

discretionary duty each member then serving personally owed and did not discharge, and at each regular meeting and special conference committee the Board has convened since.

50. Defendant Karen A. Ransone, M.D., is sued in her individual capacity. Ransone served on the Board from 2007 through 2012, including during the May 2011 proceeding in which the Board, rather than correct the void suspension, "continued" it and conditioned Dr. Doe's licensure on monitoring premised on an impairment its own evaluators had excluded, and returned to the Board and served continuously from 2019 until her term expired in June 2024, latterly as its Secretary-Treasurer. She served on the Board's Executive Committee, the body that sets the Board's agenda and determines the matters brought before it, during the period in which Dr. Doe's May 12, 2022 and February 7, 2024 petitions were pending and unanswered. With knowledge of Dr. Doe's file from her prior service and actual notice, through the Board's institutional records and the petitions lodged with the Board during her service, that no felony conviction existed, she participated in or, having the authority and the duty to convene the special conference committee, to hold the proceeding, and to vote to do so, acquiesced in the Board's continuing refusal to do so throughout her service.

## IV. ENTITY DEFENDANTS

51. Defendant Virginia Department of Health Professions ("DHP") is the public agency that regulates the healing arts in the Commonwealth and entered the 2007 order. Its official address is 9960 Mayland Drive, Suite 300, Henrico, Virginia 23233. DHP is sued as a public entity under Title II of the ADA and as a recipient of federal financial assistance under § 504 of the Rehabilitation Act.

52. Defendant Virginia Board of Medicine ("the Board") is the public entity within DHP that regulates the practice of medicine and that alone may convene the committee and hold the corrective proceeding. Its official address is 9960 Mayland Drive, Suite 300, Henrico,

Virginia 23233. The Board is sued as a public entity under Title II of the ADA and as a recipient of federal financial assistance under § 504 of the Rehabilitation Act.

## V. DOE DEFENDANTS

53. Defendants John Does 1 through 50 are members of the Virginia Board of Medicine and personnel of the Board and the Department of Health Professions, sued in their individual capacities, whose participation in the continuing course of conduct alleged is reflected in the Board's institutional records but whose identities or specific roles are not presently known to Dr. Doe and will be ascertained through discovery. The Board comprises an eighteen-member body together with eleven professional advisory boards and executive and disciplinary staff, the composition of which has changed across the period relevant to this Complaint. The deprivation has been continuous: from Dr. Doe's first request for correction on May 8, 2007 to the present, the Board has refused at every opportunity to convene the committee and hold the proceeding it alone may convene, and each member and officer who, having the authority and the duty to convene or to vote to convene that proceeding, declined to do so while the deprivation continued participated in or acquiesced in the continuing violation. The John Doe Defendants are grouped by the era in which they served and acted: (i) 2007 through the May 2011 proceeding; (ii) the February 2013 proceeding; (iii) the 2015–2019 period; (iv) the 2022 petition; and (v) the period after June 7, 2024, including the September 13, 2024 meeting at which the hearing mandated by Virginia Code § 54.1-2409(D) was due and was not held, and each meeting since. Each is alleged to have participated in, directed, or, having the authority and the duty to convene the committee, to hold the proceeding, and to vote to do so, declined to do so, acquiesced in the deprivations within his or her era, including the refusals to convene the committee and hold the corrective proceeding, the maintenance and publication of the false characterizations, and the denials of Dr. Doe's petitions, with actual notice, through the Board's institutional

records and the petitions lodged with the Board during that service, that no felony conviction existed. Dr. Doe will seek leave to substitute their true names upon their discovery.

54. Dr. Doe's identification of the individual Defendants named herein is without prejudice to his right, upon a declaration that the 2007 order is void ab initio, to seek leave to add such additional members and officers of the Board and the Department, including persons who held the authority and the duty to convene the committee, to hold the proceeding, and to vote to do so at any time from May 8, 2007 forward and declined to do so, as discovery and the Court's determinations may show to be liable for the continuing deprivation.

55. **Defined terms.** As used in this Complaint: "the Board" means the Virginia Board of Medicine, acting through its members and staff then serving; "the Department" or “DHP” means the Virginia Department of Health Professions; "the Defendants," unless otherwise specified, means the individual Defendants named above together with the Board and the Department; and "the individual Defendants" means Harp, Owens, Deschenes, Clements, Marchese, Rathmann, Dave, Ransone, Apel, Vaughan, and John Does 1–50. Where an act or omission is attributed to "the Board" or "the Defendants," it is attributed to each individual Defendant who, during the era in which the act or omission occurred, held office or employment with the authority and the duty to act and who participated in, directed, or, having that authority and duty, acquiesced in it, as further specified in the Parties section and in the count-specific allegations below. Attribution by defined term is for economy of pleading and does not relieve any Defendant of the individualized allegations made against him or her by name in the Parties section and the Counts.

## STATEMENT OF FACTS

## I. THE SINE QUA NON THAT NEVER EXISTED

56. Dr. Doe's license to practice medicine is a property interest of constitutional dimension. A physician may not lawfully practice medicine in Virginia without a license, and the license, together with the established practice, professional standing, and livelihood it makes possible, is property of which the Commonwealth may not deprive him without due process of law.

57. Dr. Doe also holds a liberty interest in his good name and professional reputation, in his board certification and the credentials he earned, and in his freedom to pursue his chosen occupation, interests the Commonwealth may not destroy by publicly branding him with false and stigmatizing charges, or by foreclosing his ability to work in his profession, without due process.

58. The suspension of Dr. Doe's license deprived him of the property interest; the suspension and the subsequent public mischaracterization of him as a convicted felon and an impaired physician deprived him of the liberty interest. Both deprivations, and their continuation to the present, underlie the claims set forth below.

## II. BACKGROUND

59. From August 7, 1991 until April 26, 2007, Dr. Doe held a full and unrestricted license to practice medicine and surgery in Virginia, with an unblemished disciplinary record.

60. From 2001 to 2006, Dr. Doe voluntarily placed his license on inactive status for medical reasons.

61. Dr. Doe served as an officer in the United States Navy, attained the rank of Lieutenant Commander, and received an Honorable Discharge in 1997.

62. Beginning in 1997, he built a private medical practice in Virginia under a hospital support contract that guaranteed a minimum of $900,000 over twenty-four months.

63. Dr. Doe exceeded that minimum by the eighteenth month and practiced there until his medical leave began in 2001.

## III. THE FELONY CHARGE THAT WAS MISTAKEN FOR A CONVICTION

64. In 2004, while Dr. Doe's Virginia license was inactive, a matter at his residence in Colorado gave rise to criminal charges: 1) two Class 3 misdemeanors, the lowest misdemeanor classification under Colorado law, and 2) two Class 5 felony counts of menacing with a weapon.[3]

65. Colorado empowers prosecutors to offer deferred judgment and dismissal of felony charges to eligible defendants, whereby the defendant enters a conditional and revocable plea of guilt to the felony charge and is placed on conditions and supervision by the prosecution for a period not to exceed four years while the case is continued without adjudication.

66. Under Colorado law as it stood at that time, when a defendant was offered and accepted a deferred adjudication, a court accepted the defendant's conditional guilty plea and, by stipulation among the defendant, the prosecution, and the court, deferred both judgment and sentence, placing the defendant under supervision for a fixed period. Colo. Rev. Stat. § 18-1.3-102.

67. During the deferral period, the court is without authority to enter a judgment of conviction on the deferred count. A judgment of conviction may enter only if the prosecution applies for revocation, a hearing is held, and a violation of the terms is proven by a preponderance of the evidence.

68. Upon successful completion of the deferral, the guilty plea is withdrawn and the deferred charge is dismissed with prejudice by operation of the statute. No further order of the court is required, and no judgment of conviction ever exists.

69. The mechanism is thus not a conviction with conditions attached. It is the absence of a judgment of conviction, conditioned during the deferral and made permanent upon completion by revocation of the conditional guilty plea and by dismissal of the charge.

70. The two felony counts against Dr. Doe alleged the same conduct arising from a single event.

---

3 Again, this charge is a Class 1 misdemeanor in Virginia.

71. As part of the plea agreement, the two felony counts were merged into a single felony count.

72. By an Order and Stipulation for Deferred Judgment and Sentence entered September 6, 2005, judgment and sentence on the single felony count were deferred upon Dr. Doe's conditional plea of guilty and Dr. Doe entered Colorado's supervised program on that count.

73. Dr. Doe complied with all of the conditions of deferral. At no time did the prosecution apply to revoke the deferral.

74. On March 16, 2007, the prosecution acknowledged that Dr. Doe had successfully completed every term of the program and issued him a Certificate of Completion.

75. Upon that completion, by operation of Colorado law, Dr. Doe's guilty plea was withdrawn and the felony charge was dismissed on that date.[4]

76. No judgment of conviction on any felony was ever entered against Dr. Doe, in Colorado or anywhere else.

77. As part of his contract, Dr. Doe agreed to accept a conviction on the two misdemeanor charges.

78. Knowing that the felony charge would be dismissed, Dr. Doe arranged to return to practice.

79. In December 2006 he contracted with Fairmont Physicians, Inc., a West Virginia practice group, for a six-month paid, supervised clinical-reentry program leading to a full position and a two-year partnership track. On December 27, 2006, his treating physician advised the West Virginia Board of Medicine in writing that Dr. Doe was "ready to return to the practice of medicine." On January 16, 2007, an independent forensic psychologist examined Dr. Doe, found no indication of any substance-abuse problem and nothing that would prevent him from practicing as an obstetrician-gynecologist, and cleared him to return to practice.

[4] The Supreme Court of Colorado has ruled that once a defendant completes the deferral program, he is entitled to dismissal by statute and that no formal order of dismissal is necessary. The duty of the judge to enter the order is mandatory, not directory, and so the charges are dismissed and the conditional plea of guilt is withdrawn on the date of completion of the deferral program and not on the later date when the judge actually enters the order of dismissal.

80. As of March 16, 2007, then, Dr. Doe had no felony conviction of record, a documented recovery, an independent clearance to practice, and an executed contract to resume his career. The events that follow occurred forty-one days later.

81. In early 2007, Dr. Doe voluntarily contacted Virginia's practitioner health monitoring program ("HPMP") through a telephone call with its representative, Kammerer, and disclosed that he was not in practice, had applied for a West Virginia license, resided in West Virginia, and had participated in a comparable monitoring program in Colorado. HPMP relayed that confidential disclosure to the DHP and the Board. The DHP separately received an unsworn third-party telephone call characterizing Dr. Doe as a convicted felon.

82. Acting on those communications, the DHP obtained a certified copy of Dr. Doe's Colorado court file. The Colorado clerk certified that file on April 17, 2007. It contained the record of Dr. Doe's successful completion of diversion.

83. On April 26, 2007, nine days after the Colorado clerk's certification, and forty-one days after Dr. Doe completed diversion, the Director of the DHP, Sandra Whitley Ryals, suspended Dr. Doe's license. She did so without notice, without a hearing, and without any opportunity to be heard, acting solely under Virginia Code § 54.1-2409(A). The order recited that the DHP had "received and acted upon evidence" that Dr. Doe "was convicted of a felony."

## IV. THE NINETEEN-YEAR FIGHT TO CORRECT DHP'S ERROR

84. Section 54.1-2409(A) supplied the Director's only authority to act, and it conditioned that authority on a single fact. In relevant part, it provided:

> Upon receipt of **documentation by any court** or government agency that a person licensed … by a board within the Department of Health Professions **has … been <u>convicted</u> of a felony** …, the Director **<u>shall</u>** immediately suspend, **<u>without a hearing</u>**, the license … of any person so convicted …. Such notice shall include a copy of the documentation from such court or agency, **certified by the Director** as the **documentation** received from such court or agency. Such person shall not have the right to practice within this Commonwealth until his license … has been reinstated by the relevant board within the Department of Health Professions. (emphasis added)

85. The certified record on which the Director relied showed the opposite of what her order recited. Director Ryals personally certified that Colorado record as the documentation she had received, as Commonwealth's Exhibit 1, "Judgment of Conviction Sentence – Amended." On its face, that record placed the single felony count on the deferred-judgment diversion program ("Diversion Program 4.00 YEARS," under "DJ&S"), and the only counts carrying an entered sentence were the misdemeanors. Although the document bore a pre-printed "judgment of conviction" caption (Colorado's standard form reflecting misdemeanor sentencing), it recorded no felony conviction, because the felony count had been deferred. The record documented no felony conviction.

86. Dr. Doe has never been convicted of any felony in Colorado or anywhere else.

87. On May 8, 2007, promptly after receiving the suspension order, Dr. Doe, through counsel, asked the DHP and the Board to correct the suspension and exonerate him. He provided the official court documents establishing that no felony conviction existed, together with the diversion program's own published description that a deferred judgment "allows the client to … avoid having a conviction entered on his record."

88. Three days later, on May 11, 2007, and despite the documents in its possession, the Department reported the suspension to the National Practitioner Data Bank on the basis of a felony conviction.

89. Dr. Doe has never been afforded an opportunity to be heard by the Director to correct the suspension. Virginia provides no mechanism by which a licensee may be heard before the Director on a suspension entered, without a hearing, under § 54.1-2409(A).

**A. The Suspension Destroys the Fairmont Contract and Forces Dr. Doe into the Board's Reinstatement Process**

90. The unlawful suspension immediately devastated Dr. Doe's career. He had arranged West Virginia licensure to begin the Fairmont reentry program, and the West Virginia Board of

Medicine had approved the supervised mini-residency arranged for him; but that Board advised that it could not issue him a license while his Virginia license remained suspended, even as it recognized that Dr. Doe was not a convicted felon. The Virginia suspension thus destroyed the Fairmont contract before Dr. Doe could perform his duties as a licensed physician pursuant to it.

91. After the suspension issued, Dr. Doe also inquired whether resuming his Virginia practice remained possible. It did not. The hospital's Chief of Staff told him the option was foreclosed: the hospital had learned of the suspension order and understood Dr. Doe to be a convicted felon, and on the strength of that false characterization expressed personal revulsion rooted in his own misunderstanding of the underlying matter. The suspension and the felony brand thus destroyed not only the Fairmont contract but the established Virginia practice Dr. Doe had held in reserve.

**B. The Suspension of Dr. Doe's Medical License Was Not Appealable**

92. There was no way to appeal or to seek judicial review of the 2007 order that suspended Dr. Doe's medical license.

93. The 2007 suspension order was not an "agency action" as defined by the Code of Virginia.

94. The 2007 suspension order was not a "case decision" as defined by the Code of Virginia.

95. The 2007 suspension order was not a regulation promulgated by the Virginia Department of Health Professions.

96. Under Rule 2A:2(c) of the Rules of the Supreme Court of Virginia, a final agency case decision is required to inform the party of the deadline for filing a notice of appeal.

97. The 2007 suspension order, unlike the Board orders that later resulted from it, advised Dr. Doe of no right to appeal and of no time within which to seek one, facial evidence that it was not an appealable order.

98. The Department's own licensing office told Dr. Doe's counsel on May 8, 2007 that, on the documentation Dr. Doe already held, "more likely than not there will not need to be a hearing …

just reinstatement." The Department represented at the outset that its error was curable administratively, without a hearing.

99. The DHP and Board conceded in briefing to the Court of Appeals of Virginia in 2017 that "A mandatory suspension issued pursuant to Virginia Code § 54.1-2409 is not appealable under the VAPA. Actions under that statute are mandated by the General Assembly and are not case decisions of a board subject to court review under Virginia Code § 2.2-4026."

100. In June 2008, Dr. Doe lost his board certification in obstetrics and gynecology as a direct result of the unlawful suspension of his medical license.

101. On August 19, 2008, the Colorado court entered a final order formally memorializing the disposition: the guilty plea was withdrawn, the felony charge was dismissed with prejudice, and the diversion sentence was voided. Dr. Doe's counsel faxed that order to the Department and the Board the same day, and it has been provided to them many times since.

### C. The Board of Medicine Forced Dr. Doe to Petition for Reinstatement Instead of Simply Exonerating Him

102. Around October 2008, after preliminary indications from Department and Board representatives that the suspension might be corrected, the Board reversed course. Through its Deputy Executive Director, Deschenes, the Board told Dr. Doe's counsel that the only way to recover his license was to file a formal Petition for Reinstatement under Va. Code § 54.1-2409(D).

103. Section 54.1-2409(D) provided, in relevant part:

> Any person whose license … has been suspended as provided in this section *may* apply to the board for reinstatement of his license …. Such person **shall be entitled to a hearing not later than the next regular meeting of the board after the expiration of 60 days from the receipt of such application** …. (emphasis added)

104. The Board thus required Dr. Doe to petition for reinstatement under the only mechanism it would recognize, a process the Board alone controlled and alone could schedule. After the

Board declined to correct the error administratively, Dr. Doe was forced to file his Petition for Reinstatement in December 2008 (Board stamped filed December 4, 2008).

**D. The Reinstatement Gauntlet: A Manufactured Conviction, Coerced Retraining, and a Hearing That Barred the Truth (2008–2011)**

105. As a condition of that December 2008 petition, the Board required Dr. Doe to sign broad releases for his sensitive personal and medical records, records the Board could not otherwise have obtained.

106. Section 54.1-2409(D) entitled Dr. Doe to a hearing no later than the Board's next regular meeting after the expiration of sixty days from his petition. The Board's next regular meeting fell on February 19–21, 2009. The Board did not hear his petition then, and did not hear it for more than two years.

107. Instead, the Board opened an investigation. Its investigator, Hopson-Bush, demanded further releases and, as directed by the Board, refused to accept any information tending to show that Dr. Doe was fit to practice or that he was not a convicted felon, accepting only material that might support denial. Among the materials the Board refused were favorable letters from his treating physicians, the forensic evaluation that had cleared him, his Colorado competency evaluation, and his psychopharmacology report.

108. On April 6, 2009, the Board's investigator interviewed the Colorado prosecutor who had handled Dr. Doe's case and recorded his statements in the Board's own record, conveying them by memorandum to the Board: that Dr. Doe "did everything the Diversion Program asked him to do … and he received a Deferred Judgment," and that "in accordance with Colorado's Criminal Law, **[Dr. Doe] is not a convicted felon**." (emphasis added)

109. On April 16 and May 5, 2009, the investigator interviewed Dr. Doe's counsel, who likewise confirmed that Dr. Doe "is not a convicted felon," and on May 5 faxed the Board

another copy of the August 19, 2008 dismissal order. The Board recorded these communications in its file.

110. Notwithstanding that record, fifty days after its own investigator memorialized that Dr. Doe was "not a convicted felon," and after it had received the Colorado dismissal order, the Board issued a Statement of Particulars on May 26, 2009 asserting that Dr. Doe had been convicted of a felony. The Board built that assertion by mischaracterizing a ministerial accounting entry, captioned "Judgment of Conviction" and dated February 6, 2006 "nunc pro tunc" to the September 6, 2005 deferred-judgment stipulation, as a conviction, directly contrary to the Colorado orders that had deferred the count and then dismissed it with prejudice.

111. The Statement of Particulars also recited a list of diagnoses that had been ruled out more than five years earlier.

112. The Board's prejudgment was explicit. In the cover letter transmitting the 2009 Statement of Particulars, Deschenes wrote that the Board "will receive and act upon evidence … to deny your petition for reinstatement."

113. In the summer of 2009, the Board, through Dixson, told Dr. Doe's counsel that his petition would be denied unless Dr. Doe satisfied new conditions: fresh competency testing, a mini-residency, and an independent medical opinion performed specifically by Dr. Joel Silverman. The Board refused to accept any other evaluator, including the forensic psychologist who had already cleared him.

114. When Dr. Doe located a program to meet those demands, the Texas A&M KSTAR program, requiring initial competency testing and then a hands-on mini-residency for which Texas required of him a visiting-physician permit, his counsel asked the Board in October 2009 to continue the December 2008 petition so that Dr. Doe could physically complete the months of testing and residency the Board now required.

115. The Board refused to continue the petition and instead required Dr. Doe to withdraw it and reapply only after he had met every new condition.

116. But for the suspension, Dr. Doe would have completed a paid, supervised residency under his Fairmont contract.

117. The Board's new demands required him to pay, again, for competency testing, for an independent evaluation, and for an unpaid residency.

118. The results contradicted the Board's characterization at every turn. On February 26, 2010, the KSTAR committee reported the results of Dr. Doe's January 2010 competency testing: "unanimous agreement that the physician demonstrated that he had the capacity to practice medicine and that he had stayed current on the basics of diagnosis and therapeutics." On the standardized computerized testing, Dr. Doe "scored one standard deviation above the comparison group in one case and did not perform any risk actions identified by the NBME in the 8 simulated cases." He "scored above average on all of the modular examinations," and the committee found he "demonstrated an appropriate fund of knowledge" and had "remained up to date with medical principals as evidenced by his scores."

119. The independent evaluations the Board itself demanded confirmed the same thing. In March 2010, a psychologist at Virginia Commonwealth University found that "[n]either psychological testing nor the clinical interview revealed the presence of psychopathology." Days later, Dr. Silverman, the very evaluator the Board had insisted upon, found Dr. Doe to be, "clinically and on psychological assessment … a psychologically normal individual," with a negative drug screen and "no evidence of repeat substance abuse."

120. In December 2010, while completing the Board's requirements, Dr. Doe finished law school, earning his J.D. six months early. On January 3, 2011, the Texas Board of Medicine, on the same record then before the Virginia Board, and under a statute that likewise barred a

visiting-physician license to anyone "convicted of a felony," issued Dr. Doe a visiting-physician license, and he began the KSTAR mini-residency in Fort Worth, Texas.

121. From January to April 2011, Dr. Doe completed that mini-residency. The program director's final evaluation, dated April 22, 2011, described Dr. Doe as "an accomplished surgeon" who "participated in 53 surgeries," "scored 97% on his final didactic exam," and earned "a 95%-tile score in the professionalism evaluation." The director concluded:

> In summary, Dr. [Doe] successfully completed all required components of the program in the above-mentioned six competency areas. His preceptor, Dr. Grimes[,] and I feel that **he is clearly competent to resume full independent practice of OB/GYN medicine**, both acute care and chronic care of women. There was no evidence of any compromise in his skills or behavior that would pose a risk to patients, in fact he has **demonstrated excellence in every competency area**. (emphasis added)

122. The Board did not hear Dr. Doe's petition until May 19, 2011, more than four years after the suspension, and more than two years after his statutory entitlement to a hearing.

123. At that hearing, Dr. Doe and his counsel were barred *in limine* from contesting the 2007 order or the determination, treated as irrefutable, that Dr. Doe had been convicted of a felony. That was the one fact on which everything turned, and the one no record supported.

124. The Board, represented by Assistant Attorney General Erin Barrett, then required Dr. Doe to prove his fitness by "clear and convincing evidence" and by the affirmative votes of three-fourths of the Board, the standard reserved for a person actually convicted of a felony, while forbidding him from showing that he had not been convicted.

125. The Board possessed Dr. Doe's medical records only because its own unlawful suspension had compelled him to produce them, and it used those records to recite "an extensive history of mental illness" and disability benefits drawn from diagnoses ruled out years earlier. Its own witnesses disowned those characterizations at the hearing.

126. Dr. Silverman, the examiner the Board had required, testified that Dr. Doe had "no psychiatric diagnosis." The psychologist testified that Dr. Doe's earlier difficulties had been

"iatrogenic … due to the medications prescribed for therapeutic purposes, and not due to a bipolar disorder," and that Dr. Doe had "no psychiatric diagnosis."

127. The Board's own findings of fact then found "no evidence of current psychopathology or substance abuse," that Dr. Doe was "safe and competent to resume full independent OB/GYN medicine," that he “now has an aversion to drugs,” and he has "no evidence of substance abuse or mental illness."

128. The Board nonetheless held, as a matter of law, that Dr. Doe had been "convicted … of a felony"; that he had committed an act "likely to deceive, defraud, or harm the public" because he had denied that conviction on his petition; and that he was unfit by reason of substance abuse and inability to practice. Having so held, the Board "reinstated" Dr. Doe only by staying the 2007 suspension and ordering that he be "CONTINUED ON INDEFINITE SUSPENSION" until he entered a monitoring contract with HPMP.

129. As the hearing closed and over the following days, Board representatives, including Dixson, Kammerer, Deschenes, and Harp, assured Dr. Doe that he need not and should not appeal: once he signed the HPMP agreement his license would be restored to full and unrestricted status, the monitoring would be limited in scope and duration, and he could work immediately, including in the medical profession within a few months.

130. On May 23, 2011, Dr. Doe received a letter signed by Deschenes stating that his license was reinstated to "full and unrestricted" status.

131. Dr. Doe relied on those assurances and did not appeal. The Board then reneged. His first HPMP appointment did not occur until August 29, 2011, ninety-seven days after the order, and well after the thirty-day period for a direct appeal had closed.

132. By inducing Dr. Doe to forgo his appeal and then withdrawing the premise for that inducement, the Board deprived him of the opportunity to be heard on direct review.

133. There has only ever been one suspension of Dr. Doe's license, the 2007 suspension, and every Board proceeding since has depended on the predicate felony conviction that never existed.

134. The Board's own May 24, 2011 order embodies that impossibility on its face. In a single passage it both recites that the Colorado court, "nunc pro tunc," "convicted him of the felony charge," and recites that the same charge "was subsequently dismissed by the Colorado Court … upon Dr. [Doe's] successful completion of the Diversion Program," a completion that, in the order's own words (quoting from the Colorado DA’s website Dr. Doe provided DHP with on May 8, 2007), "permitted [Dr. Doe] to 'avoid having a conviction entered on his record.'" The order thus convicts Dr. Doe of a felony and, in the same breath, recites the dismissal that ensured no conviction ever entered. The Board's findings of fact and its conclusions of law are likewise irreconcilable: it found "no evidence of substance abuse or mental illness," then concluded as a matter of law that Dr. Doe was unfit by reason of both.

### E. HPMP's Overreach, the Manufactured Breach, and the Three-Year Blockade of the Courts (2011–2016)

135. The monitoring the Board and Defendants had promised would be limited was not. At Dr. Doe's first HPMP appointment on August 29, 2011, ninety-seven days after the Board's order, and after his appeal window had closed, his case manager, Amy Stewart, told him that he could not work in any capacity, medical or non-medical; that he could not leave Virginia; and that he could not so much as contact a hospital or group he had spoken with before, on pain of dismissal from the program and revocation of his license.

136. When Dr. Doe asked to speak with Stewart's supervisor, the request was refused.

137. Dr. Doe's HPMP contract authorized none of that. It required only that he "inform HPMP before accepting or starting any non-healthcare related employment," a notice provision the Board had told him existed merely to schedule drug testing. HPMP converted that notice

provision into a veto over whether Dr. Doe could earn a living at all. He had never agreed to surrender to HPMP the power to decide whether he could work, in medicine or out of it.

138. In September 2011, as part of HPMP's requirements, a chemical-dependency treatment center to which Dr. Doe presented for evaluation found that he described no symptoms of chemical dependency, did not qualify for aftercare, and would not meet the criteria for admission to its treatment program at any level.

139. The conflict at the center of that control had been concealed from him. The independent medical examiner the Board required Dr. Doe to hire and pay, Dr. Joel Silverman, was, at the same time, the Chief Executive Officer of HPMP, the very program into which Silverman's evaluation funneled him. Dr. Doe learned this only by reading to the last page of the HPMP handbook he received at his August 29, 2011 HPMP appointment, where Silverman was listed as CEO. The Board and Silverman disclosed none of it, recorded none of it, and obtained no informed consent, though Virginia's conflict-of-interest law required all three.

140. HPMP's control also cost Dr. Doe a concrete path back to practice. The director of his Texas retraining program had identified Dr. Doe as a strong candidate for the teaching hospital network where he had retrained, and, that network being under a temporary hiring freeze, had lined up positions for him at hospitals in southern Texas, one of which had already acknowledged his application. The Texas route carried a defined endpoint: a year in Texas's monitoring program, which (unlike Virginia's) would have released him, followed by program-to-program transfer and unrestricted practice. HPMP forbade Dr. Doe even to return the hospitals' calls, on pain of dismissal and revocation of his license, and the opportunity was lost. The same program-to-program transferability of physician monitoring was the reason Dr. Doe had been directed to contact Virginia in the first place.

141. Over the months that followed, Dr. Doe told Stewart repeatedly, in person and in HPMP's own written "Comments/Concerns" forms, that he had no income, faced child-support

obligations he could not meet, and needed to be permitted to look for work, and he asked when he would be allowed to do so. On December 2, 2011, Stewart presented him with a new HPMP agreement and demanded that he sign it, unaltered, under threat of re-suspension and revocation. Dr. Doe signed it under written protest, stating that he did so "under duress."

142. An independent tribunal later examined this entire episode and reached the conclusion the Board would not. In its January 11, 2019 opinion unanimously recommending Dr. Doe's admission, the New York Bar's Subcommittee on Character and Fitness reviewed the Board's records, the HPMP records, the criminal records, and the witness interviews, and found:

> By mid-2011, Dr. [Doe] had been drug-free for more than five years, had graduated from law school and had successfully completed a medical retraining program. Nevertheless, Virginia imposed unjustified delay upon delay in permitting [Doe] to practice medicine, treating him as a convicted felon and a drug addict, neither of which was true. … He was informed by HPMP that he could not work as a doctor without HPMP approval; and he was further informed -without legal basis- that he also could not work as a lawyer or even as a lawyer's assistant without approval for an unspecified period of time. He also was told he could not leave Virginia, nor could he even contact [a] potential medical employer to inquire about possible employment. In effect, he was stuck in limbo with no easy way out.

143. That Subcommittee further found that Dr. Doe's own reading of his contract, that prior approval of non-healthcare employment was not required, "is correct according to the plain language of the agreement," and that "[i]t is HPMP that was overreaching."

144. On November 16, 2011, Dr. Doe notified the Board in writing that he had never been convicted of a felony, enclosing the Colorado order and the dismissal documentation establishing as much, and reported that the monitoring program was forbidding him from seeking or accepting any employment, medical or otherwise. The Board received and possessed this notification and never responded in writing.

145. In January 2012, Dr. Doe informed Stewart that he had taken non-medical work for an attorney in Atlanta, Georgia. Stewart spoke with Dr. Doe and that attorney by telephone at the firm's Atlanta office on several occasions, and HPMP accepted Dr. Doe's random drug testing at

an HPMP-approved Atlanta facility, where he completed every test. HPMP thus knew exactly where Dr. Doe was and what work he was doing.

146. The Board used that disclosed, contract-compliant work as the pretext to strip his license a second time on September 10, 2012. Acting as though Dr. Doe had never informed it, the Board emergently dismissed him from HPMP and removed the stay of his suspension, returning him to suspended status on a "breach" its own records refuted.

147. The collateral consequences spread outward. With his Virginia license in limbo, the Georgia Bar tabled and then administratively closed Dr. Doe's pending application, and the New York Bar deferred his application, though he had passed both the New York and the patent bar examinations in 2011, and later an M.B.A. and an M.S. He was not admitted to the New York Bar until May 30, 2019, after that separate tribunal's full review.

148. When the Board at last convened a hearing on February 22, 2013, it confined the proceeding to a single question: whether Dr. Doe had stopped participating in HPMP. Represented again by Assistant Attorney General Erin Barrett, the Board obtained a ruling *in limine* from hearing officer Heretick barring Dr. Doe from offering anything about HPMP's conduct, about the absence of any felony conviction, or about the unlawfulness of the 2007 order. Heretick stated that "anything giving rise to the May 2011 order is inadmissible." When counsel asked to "run through what has happened since 2007," Heretick (who was also Board President in 2007) refused: "We are here purely to focus on whether or not Dr. [Doe] is in compliance with the order of May 2011."

149. The Board also suppressed exculpatory evidence within that very hearing. It withheld from the record a December 15, 2011 report to HPMP stating that any substance-abuse or depression issues Dr. Doe had once had were long since "resolved"; the document was admitted only after Dr. Doe's counsel caught the omission.

150. On March 4, 2013, the Board issued an order, signed by Deschenes for Harp, resting

solely on Dr. Doe's purported breach of the 2011 order, again "continuing" the 2007 suspension, publicly reprimanding him, and imposing a $5,000 penalty. That order, unlike the 2007 order, advised Dr. Doe of his right to appeal. He filed a timely notice of appeal and, on May 3, 2013, a petition for appeal in the Richmond Circuit Court.

151. The Board then blockaded that appeal. Although Rule 2A:3(b) commands the agency to transmit the record "as soon as practicable," the Board refused to transmit it despite Dr. Doe's repeated requests, and the circuit court advised him that it would entertain no motions, including a motion to compel, until it received the record from the Board. The Board alone held the key, and it kept the door locked.

152. The Board held the record for more than three years. It finally transmitted it on May 26, 2016, not to let the appeal proceed, but to sustain the abstention the Defendants had obtained from the federal court days earlier, by belatedly creating the very state proceeding they had told that court was already available.

**F. The Federal Suit, the Retaliatory Report, and the Misrepresentations That Procured Its Dismissal (2015–2019)**

153. By early 2015, the Board's three-year refusal to transmit the record had blocked Dr. Doe's state appeal entirely. On March 3, 2015, Dr. Doe filed suit in this Court, asserting his rights under Title II of the Americans with Disabilities Act, the Rehabilitation Act, and the Due Process and Equal Protection Clauses, and seeking injunctive and declaratory relief.

154. Three months later, the Defendants retaliated. On June 4, 2015, with no new action, no reportable event, and no authority to do so, the DHP, through James L. Banning, Director of its Administrative Proceedings Division, filed a fresh report against Dr. Doe with the National Practitioner Data Bank (NPDB). The report recited a date of action of March 4, 2013 and branded Dr. Doe the subject of a "Criminal Conviction," as "Unable to Practice Safely by Reason of Alcohol or Other Substance Abuse," and as "Unable to Practice Safely by Reason of

Psychological Impairment or Mental Disorder."

155. Every premise of that report was false, and the DHP knew it. The Defendants, DHP and Board, held the Colorado order dismissing the felony, its own investigator's memorandum that Dr. Doe was "not a convicted felon," and their own 2011 findings of "no evidence of current psychopathology or substance abuse." They had themselves found Dr. Doe safe and competent to practice. They reported a criminal conviction, active substance abuse, and mental impairment anyway.

156. The report was unauthorized on its face. Reporting to the Data Bank must occur within thirty days of a reportable action and must bear on professional competence or conduct affecting patient health; the DHP, through Banning, filed this one more than two years after the March 2013 order it purported to "revise," on no new event, and on characterizations its own findings refuted. The report did not further the quality of health care. It served only to brand Dr. Doe a convicted, impaired felon at the moment he sought the protection of a federal court.

157. The Defendants then carried that falsehood into this Court. Opposing Dr. Doe's claims, the Defendants represented that a statute had required them to file the June 2015 report, recasting a knowing, retaliatory act as a mandatory ministerial duty. Relying on that representation, the Court treated the report as a mere continuing effect of a past act and dismissed Dr. Doe's claims as time-barred, finding no discrete act within the limitations period. Dr. Doe, then proceeding pro se, was permitted no further briefing in which to respond to the assertion, and so had no opportunity to show the Court that it was false.

158. The Defendants compounded the deception on abstention. When they moved to dismiss under *Younger*, their counsel, Assistant Attorney General Erin Barrett, assured the Court that Dr. Doe's federal claims could and would be heard in his state appeal, without disclosing that she had been the Board's counsel at the 2013 hearing, where she propagated the *in limine* ruling that barred Dr. Doe from raising those very claims. Relying on that assurance, the Court abstained

and dismissed on May 5, 2016. Days later, on May 26, 2016, the Defendants transmitted the long-withheld record, belatedly enabling the state appeal they had told the Court was available.

159. The Court of Appeals for the Fourth Circuit relied on the same assurance. On November 22, 2016, it vacated in part the dismissal of Dr. Doe's federal damages claims, accepting Barrett's representation that Dr. Doe could raise his "constitutional and federal rights … and his request for injunctive and declarative relief on these issues" in state court.

160. Barrett then reversed that representation. In the state proceeding, counsel for the Defendants argued that the *in limine* bar had been proper and that Dr. Doe had been correctly prevented from raising those very issues, the opposite of what the Defendants had told the federal courts in order to obtain abstention. On the case's return to the district court, the Defendants again moved to dismiss, and the Court dismissed on limitations grounds without ever reaching the merits of the case.

**G. The Deprivation Has Never Ended, and the Defendants Have Renewed It Since 2019**

161. After an independent character-and-fitness review, the bar-admission authority of another State admitted Dr. Doe on May 30, 2019, having examined the same Board and HPMP records the Defendants control and found the felony and addiction labels false.

162. On October 9, 2019, the Colorado court, the only court with jurisdiction over the underlying criminal matter, ordered, pursuant to Colo. Rev. Stat. § 24-72-706, that the criminal records relating to that matter "be sealed immediately," and that upon any inquiry "the person in interest and criminal justice agencies to which this Order is directed may properly reply that public conviction records do not exist with respect to the defendant." The order rested on the court's finding that the petitioner "has not been convicted of a criminal offense since the date of the final disposition of all criminal proceedings." That order reaches the records on which the 2007 suspension and every derivative Board order and report rest. It is a final judgment of a sister State, entered by the court with exclusive authority over the disposition, after this Court

last ruled in Dr. Doe's earlier federal action.

163. On May 12, 2022, Dr. Doe petitioned the Board to be exonerated, expressly invoking Virginia Code §§ 54.1-2400(10)(i) and 2.2-4019 (informal fact-finding), asking the Board to issue a "case decision" as defined in Virginia Code § 2.2-4001, and asking the Board to give Full Faith and Credit to the Colorado court's October 9, 2019 sealing order. He supported the petition with a statement from his long-term treating physician affirming his fitness to practice and the inappropriateness of monitoring a physician with no mental-health or substance-abuse issue.

164. Section 2.2-4019 entitled Dr. Doe, in an informal fact-finding proceeding, to notice, an opportunity to appear, disclosure of any contrary factual basis in the Board's possession on which it relied, a prompt decision, and a written statement of the factual or procedural basis for any adverse decision. The Board afforded him none of it. Dr. Doe received no notice of a hearing date, no appearance, no disclosure of any contrary factual basis, no case decision, and no written statement of any basis for an adverse decision, and nothing he could take to a court for review.

165. While that petition sat unanswered, Dr. Doe sought relief in the Supreme Court of Virginia. In 2023, he petitioned that court for writs of mandamus and prohibition against DHP, the Board, and the agency heads, seeking restoration of his license, a declaration that the 2007 order and every order derived from it were void ab initio, and an order directing the correction of the public records of his suspension. He argued that, because he had never been convicted of a felony, the Director had no subject matter jurisdiction to enter the 2007 order, rendering it void.

166. On August 14, 2023, the Supreme Court of Virginia denied the petition. Adopting the Defendants' characterization from their briefing, it held the mandamus action time-barred under Virginia Code § 8.01-243(B), the five-year limitations period governing civil actions that seek damages for injury to property, treating the medical license as a property interest and each challenged order as entered more than five years earlier. But Dr. Doe's petition sought no damages for injury to property. It sought extraordinary relief: writs of mandamus and

prohibition, the restoration of his license, the correction of the public records of his suspension, and a declaration that the 2007 order and every order derived from it are void *ab initio* for lack of subject matter jurisdiction (the court did not address due process, but applied the five-year statute of limitations to the challenge).

167. Because § 8.01-243(B) measures claims for damages to property, it did not reach the extraordinary relief and the void-order challenge the petition actually presented; the petition was disposed of on that threshold limitations ground, and not on the merits of whether the 2007 order is void or whether the Director had authority to enter it; and no limitations period of any kind bars a challenge to an order void ab initio, which may be raised at any time, the very rule the Court of Appeals would itself later acknowledge and then decline to apply. The court further held that, "[t]o the extent [Dr. Doe] asserts the 2007 order is void and subject to challenge at any time, he has not demonstrated the Director … lacked jurisdiction," reasoning that even if "the Director erred in concluding the documentation demonstrated [Dr. Doe] was actually convicted," the error would render the order merely voidable, not void. The court did not reach the merits of Dr. Doe's federal due-process, equal-protection, or disability claims, and prohibition did not lie because no future action remained to prohibit.

168. In opposing that petition, the Defendants characterized the Director's 2007 act as a discretionary, quasi-judicial judgment. They told the court that the Director "had to review the Colorado Order and make a judgment regarding whether that Order constituted a felony conviction," that the act "required the interpretation of Colorado law and whether that law triggered the mandatory suspension requirement in Code § 54.1-2409" and that "weighing conflicting evidence, interpreting law, and applying law to facts is the discharging of a quasi-judicial duty" requiring "the exercise of judgment, discretion." In the same brief, the Defendants asserted that the Director "does not have a duty to vacate the 2007 Order" and "does not have a duty to look back in time and review the facts and law again," and, after previously briefing the

Virginia Court of Appeals precisely the opposite, that the 2007 suspension order was a "case decision" Dr. Doe could have appealed.

169. The Defendants have elsewhere told Virginia courts the opposite. In February 2017, opposing Dr. Doe's motion to void these orders, they described the same act as ministerial, the Director was "ordered by statute to take action," and "neither the agency nor the Board have held a proceeding or made a determination, which is the definition of a 'case decision' under the VAPA," and on that ground maintained the suspension was "not … a case decision that is appealable under the Virginia Administrative Process Act." They repeated that position to the Court of Appeals in December 2017, and the Commonwealth advanced it again, successfully, in *Garada v. Virginia Board of Medicine*, No. 1306-25-4 (Va. Ct. App. May 19, 2026), persuading the Court of Appeals of Virginia that decision by the Board to not institute disciplinary proceedings against a physician was not a “case decision” under the APA because it was not a “determination” of licensure compliance.

170. Director Ryals made no “determination” when she suspended Dr. Doe’s medical license in 2007 and if she had set out to do so, basic due process would have required both notice to Dr. Doe and an opportunity to be heard on the determination.

171. In their April 2024 demurrer in the action underlying Dr. Doe's Complaint for Declaratory Relief in state court, the Defendants again characterized the 2007 suspension as an act the statute required of the Director upon her mistaken conclusion that Dr. Doe had been convicted of a felony, as quoted below. Each of these filings is a public court record.

172. The Commonwealth has described in its own words what kind of act the 2007 order was. In the demurrer it filed in the declaratory judgment action in state court, it stated that § 54.1-2409 "expressly authorized and indeed required the then-Director of DHP to mandatorily suspend [Dr. Doe's] license." In the companion plea in bar filed the same day, it described the 2007 order as "issued … pursuant to the mandate set out in Code § 54.1-2409(A), following receipt of

information that [Dr. Doe] pled guilty to a felony in a Colorado state court," (pled guilty, not convicted). The Department's published guidance likewise states that the statute "requires" suspension and that "the Department is obligated to suspend the license when it receives the information," and routes a suspended licensee solely to "an application for reinstatement," never to an appeal.[5]

173. The Commonwealth has elsewhere told the courts the same thing about the absence of any appeal. In 2017, before the Court of Appeals, it stated that a § 54.1-2409 suspension "is not appealable under the VAPA" and is "not [a] case decision[] of a board subject to court review under Virginia Code § 2.2-4026," and it prevailed on that position. The Department's own form orders confirm the distinction in practice: the 2007 mandatory suspension order carried no advisement of any right or time to appeal under Rule 2A:2(c), while the May 24, 2011 Board order, a true post-hearing case decision, did carry that advisement. The agency's own documents thus distinguish a § 54.1-2409 suspension, which it treats as carrying no appeal, from an appealable case decision.

174. At the same time, and when a contrary characterization served its purpose, the Commonwealth maintained the opposite, listing the 2007 suspension among "case decisions" in its own public records, and telling the Supreme Court of Virginia in 2023 that the 2007, 2011, and 2013 orders "are all case decisions" that Dr. Doe "did not avail himself of the opportunity to appeal," while simultaneously characterizing the same act as a discretionary, "quasi-judicial" exercise of "judgment" not subject to mandamus. The Commonwealth has thus described the identical act as ministerial and non-appealable when that defeated Dr. Doe's appeals, and as

[5] See DHP’s website, FAQ Nos. 1-2 (“requires”, “obligates”) https://www.dhp.virginia.gov/PractitionerResources/MandatorySuspensionFAQ/, and Enforcement FAQ No. 22 (circuit-court appeal reserved for post-formal-hearing orders) https://www.dhp.virginia.gov/PractitionerResources/Enforcement/FAQ/

discretionary and an appealable case decision when that defeated his mandamus.

175. Dr. Doe renewed his administrative demand. On February 7, 2024, he filed another petition for informal fact-finding and exoneration and a written reminder that, more than ninety days having elapsed, a case decision on his 2022 petition was overdue under Virginia Code § 2.2-4021(B). The petition set out eight pages of fact and law establishing that he was not a convicted felon and that the 2007 order was in error, including the Board investigator's own April 6, 2009 memorandum recording the Colorado prosecutor's statement that Dr. Doe "is not a convicted felon." It identified the misrepresentations on which the courts had relied. And it confronted the Attorney General's written assertion that "[a]ll orders entered by the Department and Board in Dr. [Doe's] case are valid and not subject to being vacated or modified" by reproducing the transcript in which the Board's own counsel had conceded, in open court on August 3, 2013, that a request to change an order "doesn't even have to be termed a petition for modification," and that the Board "has heard cases where the respondent clearly was requesting that an order be changed, and the Board reviewed it as a petition for modification and instituted informal fact-finding proceedings and then issued a case decision."

176. That same petition documented Dr. Doe's present standing on the public record. He attached a Colorado Bureau of Investigation criminal background report dated February 12, 2022 reflecting "[n]o Colorado Record of arrest." He attached the Board's own communication to actively licensed Virginia physicians, issued over Harp's name and titled "The Board's Perspective on Mental Health Treatment," in which the Board assured physicians it would not act against them for a diagnosis in remission or for seeking treatment, the opposite of how the Board had treated Dr. Doe. And, invoking the Colorado sealing order, he asked the Board to "accord Full Faith and Credit" to it and to sequester the sealed information.

177. The Board did not answer on the merits. By letter, Deschenes told Dr. Doe that Virginia Code § 2.2-4021(B) did not apply because "the Board has not held an informal fact-finding,

formal or summary case proceeding, regarding [Dr. Doe], as [Dr. Doe] has not submitted the necessary Board application for disciplinary reinstatement," requiring, as a precondition to any decision, the very reinstatement application the Board's counsel had conceded was unnecessary.

178. The Board's own instruction had told Dr. Doe that this was the required path. In her letter of September 1, 2022, Deschenes, on behalf of the Board, had written that Dr. Doe "may apply to have his license reinstated by following the Board's processes for reinstatement, i.e., submit a reinstatement application and appear before the Board for consideration of his application," and stated, "I have enclosed a reinstatement application for your convenience." Taking the Board at its word, on June 7, 2024 Dr. Doe filed the formal reinstatement petition on the Board's own form: completed, signed, fingerprinted, and notarized.

179. Dr. Doe limited the petition to the single issue that had produced the suspension. In his cover letter, counsel stated that Dr. Doe "seeks reinstatement on the **sole ground** that his medical license was suspended by the Director of the Virginia Department of Health Professions on April 26, 2007 upon the false conclusion that Dr. [Doe] had been convicted of a felony in Colorado," and that he "seeks to be heard on this **single issue** as soon as possible," having never "been afforded the opportunity to challenge the basis of the suspension of his license." (emphasis in original) The petition itself stated: "I wish to reinstate and be exonerated on the sole basis that my medical license was unlawfully suspended on April 26, 2007 by the Director of the Virginia Department of Health Professions."

180. Dr. Doe completed the Board's form but declined, by marking them out, the form's demands for broad releases of his medical and other records. The Board already possessed every record relevant to the sole issue, the criminal records underlying the 2007 order, the materials it had gathered in the investigation preceding the 2011 hearing, and the Colorado court's order sealing Dr. Doe's criminal file, which Dr. Doe had previously submitted to the Board with the request that it be maintained under seal. Dr. Doe declined to surrender records the Board did not

need and had no occasion to demand as the price of being heard on the single question of the void predicate.

181. Section 54.1-2409(D) provides that a licensee who applies for reinstatement "**shall be entitled** to a hearing not later than the next regular meeting of the board after the expiration of 60 days from the receipt of such application." (emphasis added) Deschenes' letter had framed the application as something Dr. Doe "may" file, permissive as to whether and when he applied, but once he applied, the statute's command was mandatory. Sixty days from the June 7, 2024 petition expired in early August 2024, and the Board's next regular meeting was held on September 13, 2024.[6] The Board convened that meeting and gave Dr. Doe no hearing; it held no hearing at that meeting, at any meeting since, or at all, and to the date of this Complaint has never responded to the June 7, 2024 petition in any way. The Board never rejected or returned the application, never identified any deficiency in it, and never communicated that it deemed the application incomplete or nonconforming in any respect; it received the application and simply never responded at all. As with his 2022 and February 2024 petitions, Dr. Doe received no hearing, no decision, and no forum in which to be heard, this time in direct violation of the statute's mandatory-hearing command, on the very application the Board itself had told him to file.

182. The Board's refusal did not end on September 13, 2024. The Board has continued to convene throughout the period since, holding its regular meeting and formal hearings of June 26 through 28, 2025; formal hearings on August 1, 2025 and September 5, 2025; its regular meeting and formal hearings of October 30 and 31, 2025; formal hearings on January 9, 2026; its regular meeting and formal hearings of February 19 and 20, 2026; and formal hearings on June 4 and 5, 2026. At each of these convenings the Board had the authority, the duty, and the occasion to convene the committee and hold the proceeding Dr. Doe had requested, and to afford him the

[6] Available at: https://townhall.virginia.gov/L/Meetings.cfm?boardid=26&time=pastyear.

hearing to which Virginia Code § 54.1-2409(D) entitled him, and at none did it do so. September 13, 2024 was the date on which the statute fixed the Board's duty; even if any excuse had existed for the default on that date, and none has ever been offered, each subsequent convening renewed and compounded the refusal rather than cured it. The Board alone may hold that proceeding, and at each successive meeting and hearing date it has held without hearing Dr. Doe, it has renewed its refusal to discharge the duty it alone can discharge. Each such refusal is a fresh and independent denial of the process Dr. Doe is owed under Virginia Code § 54.1-2409(D), the Due Process Clause of the Fourteenth Amendment, and the self-executing Due Process Clause of Article I, § 11 of the Constitution of Virginia, and a fresh and independent act of discrimination under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. The deprivation is therefore not a single past act but a continuing course of refusal that persisted through, and continues as of, the filing of this Complaint.

183. While the Board withheld any decision, the Court of Appeals republished the very stigma at the heart of this case. In an unpublished but publicly available opinion issued October 21, 2025, the court recited the false felony and other unproven characterizations and, on its own motion, stripped the pseudonym under which Dr. Doe had proceeded, broadcasting his identity together with the felony label anew, years after the Colorado court had sealed the underlying records. Within weeks, on November 3, 2025, a commercial legal-news publication serving the Virginia legal community republished the opinion's account under Dr. Doe's full name, recounting the suspension and the rejected challenge to it to a statewide professional audience. But for the Defendants' conduct and the resulting opinion, neither publication would exist. The characterization the Colorado court had sealed, and that the Defendants knew to be false, was thereby pushed back into public, searchable circulation.

184. The felony and diagnostic recitals in the opinion trace to the Board's Statement of Particulars, the Defendants' own contested charging document, which the Defendants placed

before the court and which their own 2011 findings had contradicted.

185. The Defendants knew the source of those recitals, knew that their own records refuted them, and corrected nothing, as set forth below.

186. The opinion was also internally divided on the one fact that controls this case. The majority acknowledged that the Colorado court had dismissed the felony, yet, deciding a question of Colorado law on a plea in bar, held that "merely completing the 'diversion program'" did "not necessarily equate to successful completion" and concluded only that "it appears that [Dr. Doe] was still 'convicted' under Colorado law" when the license was suspended. At the same time, the majority recognized the governing rule that a void order "may be attacked 'in any valid direct or collateral proceeding where the voidness of the order is properly at issue,'" and that "no statute of limitations can bar an action asserting that an order is void ab initio," then declined to apply that rule to Dr. Doe.

187. The dissent rejected that course. Judge Callins concluded that whether Dr. Doe "was convicted of a felony is a question of fact," not a legal conclusion; that "no conviction stands"; and that in deciding unsettled Colorado law on a plea in bar the majority "grasp[ed] beyond [its] reach." She would have held the 2007 order "void ab initio for lack of due process," reasoning that the reinstatement process "presumed the correctness of the initial suspension," that Dr. Doe was therefore "denied the opportunity to challenge the Board's underlying factual finding," and that the Board "persisted in thwarting [Dr. Doe’s] every subsequent effort for years thereafter," with "each compounding injury … premised on the 2007 suspension order." She further noted that "[a]s recently as 2022, [Dr. Doe] petitioned the Board for a new factfinding to exonerate him, just as the Board had done for others in the past," and that the Board again deflected him to reinstatement.

188. The majority nonetheless held Dr. Doe's claim time-barred under Virginia Code § 8.01-243(B), and the Supreme Court of Virginia denied review on June 19, 2026, foreclosing any

further state remedy and leaving the deprivation, and the republished stigma, in place. No court has ever taken evidence on or decided whether Dr. Doe was convicted of a felony, and no court has adjudicated the merits of his claims that the Defendants' continuing refusal to correct the 2007 order violates his federal rights.

189. Through all of it, neither the Board nor DHP has ever convened the committee or held the one proceeding that could correct the record and restore Dr. Doe's license, and only the Board can do so. For more than nineteen years it has refused. Each day the Board declines to act, and each time the Defendants republish the felony and impairment characterizations they know to be false, the deprivation is renewed: Dr. Doe remains suspended, publicly branded, and without any forum in which to be heard.

190. At no point in any of these proceedings have the Defendants or their counsel corrected the misrepresentations that procured the dismissal of Dr. Doe's earlier federal action, neither the representation that the June 2015 report was statutorily mandated nor the assurance that his federal claims could be heard in state court. Those misstatements stand uncorrected to this day.

**H. The Harm**

191. Before his leave, the practice Dr. Doe had built had exceeded a two-year, $900,000 contractual guarantee within eighteen months. But for the suspension, he would have begun the Fairmont reentry program in 2007, a six-month paid supervised position at $50,000, leading to a full position at a $180,000 base salary with benefits and an incentive bonus of ninety percent of net profits, and a two-year partnership track. On that structure, Dr. Doe's earnings at the full position would have exceeded $400,000 annually, and substantially more upon partnership, in then-current dollars. Instead, the suspension destroyed the Fairmont contract before it began and, in June 2008, cost Dr. Doe his board certification in obstetrics and gynecology. The lost earnings from a foreclosed medical career, compounded over more than nineteen years, are a central

component of Dr. Doe's damages; the suspension's consequences extended well beyond them, as set forth below.[7]

192. The Defendants then forced Dr. Doe to bear the costs of a reinstatement process their own void order had made necessary. Although he had already completed competency testing and a forensic evaluation, and would have completed a paid residency under the Fairmont contract, the Board required him to pay, again and out of pocket, for renewed competency testing, for an independent evaluation by the Board's chosen examiner, and for an unpaid, out-of-state retraining program, together with the travel and lodging those demands entailed, and then imposed a $5,000 monetary penalty. He also incurred years of legal expense, before the Board, before the monitoring program, and before the licensing and bar authorities of other States, defending against and seeking to undo the consequences of a suspension that should never have issued. None of those costs would have existed but for the suspension.

193. The harm cascaded into every part of Dr. Doe's life. The loss of his income left him unable to meet his court-ordered child-support obligations; the arrears mounted, and he lost his passport on that account. For years, and for lack of the funds the suspension had cost him, Dr. Doe was unable to maintain his relationships with his seven children, including the cost of the reunification services that restoring those relationships required, an injury no later recovery can fully repair. The felony and impairment characterizations the Defendants published and refused to correct obstructed his admission to the bars of other States, foreclosed specific out-of-state medical positions he was forbidden even to pursue, and closed off professional, business, and personal opportunities, domestic and international, that a physician of his record and training would otherwise have had. And the deprivation continues: Dr. Doe remains suspended, remains

[7] A non-exhaustive itemization of Dr. Doe's specific damages, costs, and out-of-pocket expenses will be produced in discovery.

branded a convicted felon and an impaired physician in the National Practitioner Data Bank, in the Defendants' records, and now in a published judicial opinion and its republication, and remains without any forum in which to clear his name. His injuries (economic, reputational, and personal), accrue anew each day the Defendants decline to convene the committee and hold the proceeding that alone can end them.

194. The suspension also cost Dr. Doe the entirety of his personal and professional property. In reliance on the Fairmont contract, Fairmont Physicians, Inc. contracted directly with a moving company to relocate Dr. Doe to West Virginia, and that company packed and took possession of his household, professional, and personal belongings for transport. When the suspension prevented Dr. Doe from obtaining West Virginia licensure and the contract collapsed, the relocation was never paid for, and the moving company seized, sold, and converted Dr. Doe's property, property worth hundreds of thousands of dollars, itemized on the company's own packing inventories. The loss included Dr. Doe's professional recording studio and original recordings, his medical equipment and records, his collections, and irreplaceable personal property of significant value, both physical and intellectual. None of it would have been lost but for the void suspension.

195. The deprivation is also self-perpetuating by design. Virginia does not require active clinical practice as a condition of licensure; many licensed Virginia physicians perform no clinical work at all and maintain their licenses through the continuing education the Board requires, and Dr. Doe has maintained that continuing medical education current through the filing of this Complaint. What Dr. Doe cannot lawfully do is maintain hands-on clinical currency, because Virginia law makes the practice of medicine without an active license a crime. See Va. Code § 54.1-2902 ("It is unlawful for any person to practice medicine … without a valid unrevoked license issued by the Board."); § 54.1-2409.1 ("Class 6 felony"). The only obstacle standing between Dr. Doe and the clinical currency any credentialing body might now ask of him

is the void suspension itself: the Defendants' own unlawful act is the sole cause of the interval they or others might now invoke. Having unlawfully forbidden Dr. Doe to practice for more than nineteen years, the Defendants may not rely on the resulting interval as a reason to withhold, delay, or condition the restoration their void order made necessary. And to the extent any reentry, retraining, or proctoring is appropriate upon restoration, Dr. Doe stands ready to complete it, as he did once before, when he satisfied the Board's every demand and was found to have "demonstrated excellence in every competency area."

**I. Animus and Bad Faith**

196. Since suspending Dr. Doe's license on April 26, 2007, the Defendants have acted toward him with animus and bad faith, refusing to correct errors they knew to be errors, advancing misrepresentations to the public and to reviewing courts, and imposing conditions they knew to be unwarranted.

197. The Board's administration of Dr. Doe's matter ran through the same hands for seventeen years. Jennie Wood, the Board's Regulatory Boards Administrator for Medicine, who had been involved in the Board's handling of Dr. Doe's 2007 request to correct the suspension, remained in that administrative role through the pendency of Dr. Doe's 2022 and 2024 petitions, until her retirement in June 2024. The institutional knowledge that no felony conviction existed did not leave the building; it was continuous.

198. The Defendants knew the felony predicate was false. The Board's own investigator memorialized an April 6, 2009 interview in which the Colorado prosecutor confirmed that Dr. Doe "is not a convicted felon." Rather than convene the hearing § 54.1-2409(D) required, the Board issued a Statement of Particulars persisting in the felony characterization, and later characterized Dr. Doe as a convicted felon "nunc pro tunc," invoking a term reserved for the correction of clerical error to supply a conviction that had never been entered.

199. The Defendants pressed that false characterization on the courts with authority they knew to be defunct. Before the Court of Appeals, they argued that Dr. Doe's conditional guilty plea was "the equivalent of a conviction," relying on that court's decision in *Starrs v. Commonwealth,* 61 Va. App. 39, 733 S.E.2d 142 (2012), which the Supreme Court of Virginia had already reversed, holding that "[u]ntil a trial court enters an order adjudicating guilt, it has not yet exercised its essential function of rendering judgment." *Starrs v. Commonwealth*, 287 Va. 1, 13, 752 S.E.2d 812, 819 (2014).

200. The Defendants took contradictory positions across forums as each suited their purpose. To defeat Dr. Doe's appeals, they maintained that a § 54.1-2409 suspension is a ministerial act and "not a case decision" subject to review; to defeat his petition for mandamus, they maintained the opposite, that the same act was a discretionary, "quasi-judicial" exercise of "judgment." They prevailed on each, on positions that cannot both be true.

201. Shortly after Dr. Doe sued the Defendants in federal court in 2015, they reported him to the National Practitioner Data Bank on no new or reportable event, and then represented to the court that a statute had compelled the report, thereby obtaining the dismissal of his claims. The Department's own report history confirms that the June 2015 report served no reporting purpose: the Board action of March 4, 2013 had already been reported to the Data Bank on March 28, 2013, and the June 4, 2015 report described the identical action and the same dispositions, adding nothing new. No new action, finding, or reportable event had occurred in the interval; the only intervening event was Dr. Doe's lawsuit.

202. The Defendants have continued to publish the false characterizations over their own filings to the present. In the demurrer and plea in bar they filed on April 23, 2024, they characterized the 2007 suspension as resting on Dr. Doe having "pled guilty to a felony." In their September 6, 2024 filing opposing Dr. Doe's motion to stay, they represented that Dr. Doe's failure to appeal the 2007 order had rendered it final and the law of his case, while

simultaneously maintaining, as they have for years and as the Commonwealth advanced again, successfully, in *Garada v. Virginia Board of Medicine* in May 2026, that a § 54.1-2409 suspension is not appealable at all; the appeal they faulted Dr. Doe for not taking is one the Commonwealth insists has never existed. And in their February 3, 2025 brief to the Court of Appeals of Virginia, they repeated the felony and impairment characterizations their own records refute. Each of these filings is a public court record, published within the two years preceding this Complaint.

203. The Defendants have never corrected any of these representations, though the duty to correct is continuing. A party and its counsel remain under an ongoing obligation of candor to the tribunals before which they appear, including the obligation to correct material misrepresentations of fact and law on which a court has relied. Dr. Doe's counsel invoked that duty directly. On July 31, 2024, before the Campbell County Circuit Court, he raised the prior misrepresentations, and the Defendants' counsel responded only that the Defendants had not waived anything as to their prior representations or arguments. On January 3, 2025, before the Court of Appeals of Virginia, he raised them again: that the Defendants had obtained their rulings by representing to the tribunals that Dr. Doe had been convicted of a felony when they knew he had not, and by reciting overruled case law to argue that his Colorado conditional guilty plea was tantamount to the conviction necessary to suspend his license without notice. The Defendants neither corrected nor withdrew the representations. And when the Court of Appeals' October 21, 2025 opinion recited as fact the felony characterization and diagnoses the Defendants' own records showed had been ruled out years earlier, the Defendants, knowing the recitals to be false and knowing the court had drawn them from the Defendants' own submissions, corrected nothing, and have corrected nothing since. The failure to correct is not a past act but a continuing omission, renewed each day the false record on which courts have relied and acted stands uncorrected. To the present day, the Defendants continue to portray Dr.

Doe as a convicted felon and an impaired physician, in records, reports, and filings they know to be false, and refuse to convene the committee and hold the proceeding that alone could correct them.

**J. The Defendants Treated Other Physicians Fairly and Promptly after Suspending Licenses under Code § 54.1-2409**

204. The Department's own application of § 54.1-2409 shows precisely what the statute requires, and what distinguishes a conviction from a guilty plea that never became one. Six days before Dr. Doe's suspension, the same Director, Sandra Whitley Ryals, suspended the license of another physician under § 54.1-2409, reciting that she had "received and acted upon evidence that [the physician] was convicted of a felony charge in the United States District Court … to wit: Acquiring a Controlled Substance by Fraud," and attaching "[a] certified copy of the Judgment in a Criminal Case." That physician had pleaded guilty but the federal court had then adjudicated him guilty, entered a Judgment in a Criminal Case, and sentenced him to probation, a fine, and restitution. The Director certified that she had received and attached that judgment of conviction. The same Director had, roughly two weeks earlier still, suspended a third physician's license under the same statute, likewise reciting a felony conviction and attaching a certified Judgment in a Criminal Case.

205. Dr. Doe's suspension, entered by the same Director under the same statute on April 26, 2007, used identical language, that the Department had "received and acted upon evidence" that Dr. Doe "was convicted of a felony," but no judgment of conviction existed and none was attached. Dr. Doe had pleaded guilty, as the other physician had; unlike the other physician, Dr. Doe was never adjudicated guilty and never sentenced on the felony. His conditional plea had been withdrawn and the charge dismissed upon his completion of diversion. The document the Director received and acted upon was a record of that deferred disposition, not a Judgment in a Criminal Case. The same Director who, days before, had demanded and attached an actual

judgment of conviction to suspend two other physicians attached no such judgment to Dr. Doe's order, because none existed.

206. The Department's practice under § 54.1-2409(A) has remained uniform through the present, and confirms that a suspension under the statute is met with reinstatement, not appeal. As recently as 2026, the Department entered a series of mandatory-suspension orders under § 54.1-2409(A) including orders entered in March, April, May, and June 2026, each signed by the current Director, uniformly advising the suspended physician that he or she "may apply to the Board for reinstatement," that reinstatement "shall require the affirmative vote of three-fourths of the members of the Board present at the hearing," and of no right of appeal or judicial review whatsoever.[8] The Department's standard notice advises every § 54.1-2409(A) suspended practitioner of the reinstatement process alone, the same process to which it confined Dr. Doe, and of no avenue to contest the suspension in any court.

207. The Department's application of § 54.1-2409(A) to other physicians, in the same years and over the names of the same officials, shows what the statute permits and what the Defendants withheld from Dr. Doe. In each instance below the suspension issued under the identical "received and acted upon evidence" recital, and in each the Board convened the proceeding the statute affords and promptly restored the licensee to full and unrestricted status.

208. Another Virginia physician was suspended under § 54.1-2409(A) on the strength of an out-of-state license action. The Board convened a formal reinstatement hearing, and although the record before it established that the physician had pleaded guilty to a felony and had admitted active alcohol impairment, grounds the Board itself charged under § 54.1-2915, it heard him and restored him to unrestricted practice in less than a year. The Executive Director who signed that

[8] The comparators are publicly available via download on DHP's past action search engine, at: https://www.dhp.virginia.gov/enforcement/cdecision/cd_advSearch.asp. Copies of the specific orders and other published materials will be produced at the court's request or in discovery.

physician's reinstatement is a Defendant here, and the Board President who presided is a Defendant here; both held office in the same period the Board "continued" Dr. Doe's suspension and refused to hear him.

209. Another physician was suspended under § 54.1-2409(A) on an out-of-state suspension that was lifted before the Board ever convened, so that, by the time of his hearing, the predicate no longer existed. The Board nonetheless convened a full hearing, found the matter cured, and restored him to full and unrestricted status within roughly two months. When a § 54.1-2409(A) predicate failed, the Board's response was to hear the licensee and correct the record.

210. And when another practitioner's out-of-state predicate was cured, the Board restored him to full and unrestricted status by consent nineteen (19) days after the suspension entered, and within a week of the predicate's cure. There is no construction of the Defendants' own statute under which nineteen (19) days suffices to restore a licensee whose predicate was real, but over nineteen (19) years does not suffice even to hear one whose predicate was false. See ¶ 17 (Introduction).

**K. The Mandatory Decision-and-Review Pathway the Board Affords Others but Denied Dr. Doe**

211. Virginia law lays down a single, mandatory pathway by which a physician who gives the Board information that an order against him is erroneous may obtain a corrected case decision and, if that decision is adverse, judicial review of it. The Board is required to open that pathway, has opened it for other physicians, and has refused for more than nineteen years to open it for Dr. Doe. Its steps are fixed. Upon **receipt of information** (information, not any particular petition or application) that a practitioner may be subject to disciplinary action, the Board's enumerated **duty** is to appoint a special conference committee to act under Virginia Code § 2.2-4019. Va. Code § 54.1-2400(10). That appointment is not discretionary: where the General Assembly meant the Board's convening power to be discretionary, it said so in the very next subdivision,

empowering the Board to "convene, at their discretion," a formal panel (a qualifier it pointedly omitted from the special-conference-committee duty). Compare Va. Code § 54.1-2400(11), with § 54.1-2400(10). The committee's discretion extends only to the result it reaches; it "may" exonerate, reinstate, or modify a previous order. § 54.1-2400(10). The informal fact-finding it conducts must give the licensee notice, an opportunity to appear, disclosure of any contrary fact basis in the agency's possession that could support an adverse decision, a prompt decision, and, if the decision is adverse, a written statement of its factual or procedural basis. § 2.2-4019(A). The **decision must come within ninety days**; if it does not, the licensee may serve notice that it is due. § 2.2-4021(B). A request to terminate an existing order is itself a "case" the Board must decide, for the termination of an order is a "right or benefit" within Virginia Code § 2.2-4001. See *Accomack County v. Burnley*, 66 Va. Cir. 83, 86 (2004). And because a tribunal speaks only through its written order, see *Wagner v. Shird*, 257 Va. 584, 588 (1999), that written case decision is the **prerequisite to court review**: only a party aggrieved by a case decision may obtain "direct review thereof" in the circuit court, and from there to the appellate courts. § 2.2-4026(A). The ninety-day command exists for exactly this situation, to keep an agency from escaping decision forever by deeming its fact-gathering perpetually unfinished, the evil the Supreme Court of Virginia identified in *Rizzo v. Virginia Retirement System*, 255 Va. 375, 384, 497 S.E.2d 853, 856-57 (1998), and that the General Assembly addressed by its 2006 amendment, under which the time to render an informal-fact-finding decision runs from the commencement of the informal fact-finding itself rather than from any proceeding the agency may elect to hold. The Board has defeated this entire pathway at its first step. It never appointed the committee, never held the proceeding, and never rendered the case decision, so no order has ever existed for Dr. Doe to carry into any court, even though, by its own counsel's admission in open court, the Board has convened that same process and issued case decisions for other physicians who asked it to change their orders.

212. Dr. Doe first gave the Board that information on May 8, 2007, when his counsel furnished the official court documents establishing that no felony conviction existed and asked the Board to correct the suspension and exonerate him. That submission was "information that a practitioner … may be subject to disciplinary action" within the meaning of Virginia Code § 54.1-2400(10), and it triggered the Board's duty to appoint a special conference committee to proceed under § 2.2-4019. No committee was appointed, and no proceeding was held.

213. That the trigger is "information," and not any prescribed petition or application, is not Dr. Doe's characterization but the Board's. Through its counsel, the Board has admitted in open court that a licensee's request to change an order "doesn't even have to be termed a petition for modification," and that the Board "has heard cases where the respondent clearly was requesting that an order be changed, and the Board reviewed it as a petition for modification and instituted informal fact-finding proceedings and then issued a case decision." The Board has thus afforded to other physicians the very process (informal fact-finding culminating in a case decision), that it has refused to afford Dr. Doe.

214. Dr. Doe invoked that process again in the form the Board now says it requires and in the form it admits is unnecessary alike. On May 12, 2022, he petitioned the Board, expressly under Virginia Code § 2.2-4019 and § 2.2-4001, to convene informal fact-finding and to issue a case decision, and to accord full faith and credit to the Colorado sealing order. The petition was a "case" the Board was obligated to decide: the termination or modification of an existing order is a "right or benefit" within § 2.2-4001. See *Accomack County v. Burnley*, 66 Va. Cir. 83, 86 (2004). The Board appointed no committee and held no proceeding.

215. When more than ninety days passed without a decision, Dr. Doe served the Board with written notice that a case decision was due, citing § 2.2-4021(B). On February 7, 2024, his counsel renewed the demand and made the predicate unmistakable, attaching a copy of the transcript in which the Board's own counsel had made the open-court admission described above,

and citing the Board's duty under § 54.1-2400(10) to convene. The Board still appointed no committee, held no proceeding, and rendered no decision.

216. Each of Dr. Doe's petitions of May 12, 2022, February 7, 2024, and June 7, 2024 was addressed to the Board, was received by the Board, and was lodged in the Board's file, where it was available to every member and officer then serving.

217. The Board's written response confirmed that it was withholding the process, not merely delaying it. By letter dated September 1, 2022, Deschenes, on the Board's behalf, told Dr. Doe that his only path was to "submit a reinstatement application and appear before the Board," redirecting him to a forward-looking application the Board's own counsel had conceded was unnecessary, in place of the informal fact-finding the statute commanded. By later letter, Deschenes told Dr. Doe that § 2.2-4021(B) did not apply at all because "the Board has not held an informal fact-finding, formal or summary case proceeding, regarding [Dr. Doe]," treating the Board's own refusal to hold the proceeding as the reason the decision deadline never ran. The Board thus made its failure to act the justification for its failure to decide.

218. The hearing to which Virginia Code § 54.1-2409(D) entitled Dr. Doe was a duty the statute placed on the Board itself. By its terms, a licensee who applies for reinstatement "shall be entitled to a hearing not later than the next regular meeting of the board after the expiration of 60 days from the receipt of such application." The obligor the statute names is "the board," not its staff, not its Executive Director, and not its disciplinary personnel. Dr. Doe's June 7, 2024 application started the sixty-day period; it expired in early August 2024; and the Board's next regular meeting was held on September 13, 2024. On that date, the members of the Board then serving had a non-discretionary statutory duty, owed personally by each of them and triggered on a date certain, to afford Dr. Doe the hearing the statute commanded. The Board held that meeting and gave Dr. Doe no hearing, not at that meeting, at any meeting since, or at all, and has never responded to the June 7, 2024 application in any way, never rejected it, never

returned it, and never identified any deficiency in it. The breach was not the act of staff to whom a duty had been delegated; it was the failure of the Board, and of its members present, to discharge a duty the statute assigned to them by name.

219. What the Board did at that September 13, 2024 meeting confirms both the deprivation and its selectivity. A panel of the Board (Clements, Apel, Rathmann, Vaughan, and Marchese), convened that day and took up the reinstatement of other physicians, considering and approving proposed consent orders to reinstate the licenses of three presented practitioners. On a motion by Marchese, seconded by Clements, the panel approved those reinstatements by unanimous vote. The Board thus sat, on the very date Dr. Doe was statutorily entitled to his hearing, as a body convened to reinstate licensees, and reinstated three of them, while affording Dr. Doe, whose reinstatement petition had been pending since June 7, 2024, no hearing, no proceeding, and no decision of any kind. The members who reinstated others that day had before them the means and the occasion to hear Dr. Doe, and did not.

220. The consequence is the one the statutory scheme is built to prevent. Because the Board never appointed the committee, never held the proceeding, and never rendered a case decision, no order has ever issued that Dr. Doe could carry into a circuit court under § 2.2-4026, which affords review only to a party "aggrieved by … a case decision." The Board alone may open this pathway; for more than nineteen years it has refused to take the first step, and by refusing it has foreclosed every step that follows: the proceeding, the decision, and the judicial review the decision alone unlocks.

## COUNT I

### Unconstitutionality of Virginia Code § 54.1-2409(A) as Applied to Dr. Doe and to Licensees Suspended on a Nonexistent Predicate

**(42 U.S.C. § 1983; U.S. Const. amend. XIV; Va. Const. art. I, § 11)**

221. Dr. Doe realleges and incorporates paragraphs 1 through 220 as if fully set forth herein.

222. The conduct alleged in this Count was committed as follows. Ryals applied § 54.1-2409(A) to suspend Dr. Doe's license on a predicate felony conviction that did not exist and that the documentation before her refuted, and Harp, Owens, Deschenes, and the members and officers of the Board (Clements, Marchese, Rathmann, Dave, Ransone, Apel, Vaughan, and John Does 1–50), have maintained the suspension under that statute and denied Dr. Doe any neutral forum in which to contest the predicate, including at the September 13, 2024 meeting, at which the members then sitting held proceedings for other physicians while affording Dr. Doe no hearing and no forum in which to contest the nonexistent felony predicate. Each is sued for his or her own acts and omissions as set forth in the Parties section and the Statement of Facts.

223. Virginia Code § 54.1-2409(A) mandates that, upon receipt of documentation that a licensee has been convicted of a felony, the Director "shall immediately suspend, without a hearing," the license. The statute supplies no pre-deprivation process, and, as the Defendants have construed and applied it to Dr. Doe, no mechanism by which a licensee may ever contest, before any neutral decision maker, the single fact on which the suspension depends: whether the predicate felony conviction exists.

224. A medical license is a significant property interest protected by the Due Process Clause, which forbids its deprivation without a meaningful opportunity to be heard on the dispositive fact, at a meaningful time, before a neutral decision maker.

225. As applied to Dr. Doe, § 54.1-2409(A) deprived him of that interest on a predicate that did not exist, i.e., no felony conviction, and then left him no avenue to prove it.

226. The Defendants have conceded that a suspension under the statute is "not a case decision" subject to administrative or judicial appeal; the Director who suspends a medical license under that statute is both the recipient of the documentation and the sole judge of what it shows; and the only path the statute offers a suspended licensee is the reinstatement provision of subsection

(D). The Department's own uniform practice confirms the defect: its standard § 54.1-2409 notice, including notices issued as recently as 2026, advises every suspended physician of the reinstatement process alone and of no right of appeal or judicial review. See ¶ 206. The reinstatement process is not one avenue among several; by the Department's own account it is the only one.

227. Subsection (D) is no remedy for the defect. It presupposes the validity of the suspension and offers only a forward-looking application to be relicensed, a process that, as applied to Dr. Doe, required him to proceed as a presumed felon and presumptively impaired physician; shifted to him the burden of proving his own fitness; subjected him to invasive inspection of highly personal information as the price of being heard; conditioned relief on the affirmative vote of the Board; and, even if granted, would not restore his record or erase the unlawful suspension.

228. A constitutionally adequate post-deprivation remedy must afford the wrongly-suspended licensee a clean slate, an opportunity not merely to reapply for what was wrongly taken from him going forward, but to correct the error and clear the record of a deprivation that should never have occurred. Subsection (D) offers no such opportunity. A process that assumes the correctness of the very fact in dispute, that requires the licensee to disprove a status the statute never lawfully attached to him, and that cannot restore what the error took, affords no meaningful opportunity to be heard on that fact at all.

229. The inadequacy is not merely theoretical. When Dr. Doe invoked subsection (D) precisely as the Board directed, the subsection's own mandatory guarantee, a hearing at the Board's next meeting, was ignored. A remedy the agency will not honor even on its own terms is no remedy at all.

230. On the Defendants' own construction, a licensee whose § 54.1-2409(A) predicate fails has no remedy but the reinstatement provision of subsection (D), a forward-looking application

that presumes the suspension valid and requires the licensee to prove his fitness as though the predicate were true.

231. Yet the Defendants did not themselves believe that. When another physician's predicate was lifted before his hearing, the Defendants convened a proceeding and restored him; when another's was cured, they restored him by consent nineteen (19) days after the suspension entered, and within a week of the predicate's cure.

232. The Defendants thus afforded to others the very corrective response they tell this Court the statute does not permit, and withheld it from Dr. Doe, whose predicate never existed at all, for over nineteen (19) years. Either that corrective response exists, in which case it was denied to Dr. Doe alone; or it does not, in which case subsection (D) traps every licensee whose predicate fails, requiring the innocent to disprove a status the statute never lawfully attached to him.

233. The Defendants cannot constitutionally have it both ways, and on either branch, § 54.1-2409(A), as applied to Dr. Doe and to the class of licensees suspended on a predicate that does not exist, offers no constitutionally adequate process.

234. The constitutional defect is acute for Dr. Doe and for the class of licensees to which he belongs: those suspended under § 54.1-2409(A) on a predicate that does not exist. For such a licensee, a person who was never convicted of the felony the statute requires, the statute authorizes an indefinite deprivation of a protected interest with no pre-deprivation hearing, no appealable case decision, and a reinstatement process that presumes the truth of the very falsehood that triggered the suspension and that flips the burden of challenging a physician's fitness to practice from the Commonwealth and assigns to the physician the burden of proving his fitness to a three-quarter majority of the Board.

235. As applied to that class, the statute unlawfully deprives a non-felon of his medical license and then forecloses every avenue by which he might prove the suspension was rendered in error.

236. The Defendants' own course of conduct confirms the defect as applied. They suspended Dr. Doe on documentation that did not establish a felony conviction; they barred him in limine, in 2011 and again in 2013, from contesting the predicate; and they have duplicitously maintained, in successive proceedings over the years, both that the suspension was a ministerial act not subject to appeal and, when it suits them to argue the opposite, that the suspension was an act of discretionary judgment not subject to mandamus, each position foreclosing the review that would have proven the mistaken basis for the suspension.

237. However the statute is characterized, its application left Dr. Doe no forum to be heard on the one fact that cost him his profession.

238. Dr. Doe is therefore entitled to a declaration that Virginia Code § 54.1-2409(A), as applied to him and to licensees suspended in error on a predicate that does not exist, violates the Due Process Clause of the Fourteenth Amendment and Article I, § 11 of the Constitution of Virginia; and to an injunction prohibiting the official-capacity Defendants from giving any further effect to the suspension entered against him under it, as set forth in the Prayer.

239. As a direct and proximate result, Dr. Doe has suffered the injuries set forth in paragraphs 191 through 195, including the deprivation of his license and his profession for more than nineteen years on a predicate that never existed and with no neutral forum in which to contest it.

240. The official-capacity Defendants are subject to the declaratory and prospective relief set forth above and in the Prayer.

## COUNT II

### Procedural Due Process – Deprivation of a Protected Interest Without Notice or a Meaningful Opportunity to Be Heard

### (42 U.S.C. § 1983; U.S. Const. amend. XIV; Va. Const. art. I, § 11)

241. Dr. Doe realleges and incorporates paragraphs 1 through 240 as if fully set forth herein.

242. The conduct alleged in this Count was committed as follows. Ryals, then Director, entered the April 26, 2007 suspension on a felony conviction that did not exist, and Faye Lemon (Director of DHP Enforcement Division), acting under Ryals's direction, issued and published it without notice or hearing. Harp and Owens thereafter maintained and enforced the suspension and authorized the false characterizations. Deschenes directed Dr. Doe to a reinstatement process that presumed the suspension's validity, authored the denials of his 2022 and 2024 petitions, and demanded a reinstatement application the Board's own counsel had conceded was unnecessary. Heretick, who had been Board President when the 2007 order issued, presided over the 2013 hearing and barred Dr. Doe from contesting the predicate, sitting in judgment of a deprivation in which he had participated. And Clements, Marchese, Rathmann, Dave, Ransone, Apel, Vaughan, and John Does 1–50, as members and officers of the Board with the authority and the duty to convene the special conference committee, to hold the proceeding, and to vote to do so, refused to do so at each meeting within their respective eras of service, including the September 13, 2024 meeting at which the hearing mandated by Virginia Code § 54.1-2409(D) was due and was not held. Each is sued for his or her own acts and omissions as set forth in the Parties section and the Statement of Facts.

243. Dr. Doe holds a constitutionally protected property interest in his license to practice medicine, and a protected liberty interest in his professional reputation and in pursuing his chosen occupation. A physician may not practice in Virginia without a license, and the suspension of that license is a deprivation of property; while the suspension and the public branding of Dr. Doe as a convicted felon and an impaired physician is a deprivation of liberty. Both interests are secured by the Fourteenth Amendment and by the self-executing Due Process Clause of Article I, § 11 of the Constitution of Virginia.

244. The Fourteenth Amendment forbids the Commonwealth to deprive any person of liberty or property without due process of law. At a minimum, due process requires notice and a

meaningful opportunity to be heard, at a meaningful time and in a meaningful manner, before a neutral decision maker, on the dispositive question the deprivation turns upon.

245. Dr. Doe never received that process on the one question that controlled his case: whether he had been convicted of a felony. He received no hearing before the 2007 suspension. When he sought to correct the error, the Board directed him to its reinstatement process (a process that presumed the correctness of the suspension it was supposed to cure and switched the burden to him to regain his license), and then, at the 2011 and 2013 hearings, barred him *in limine* from contesting the felony predicate at all. At no point in nineteen years has any agency official, Board tribunal or court permitted Dr. Doe to be heard on whether the mistake of fact that triggered his suspension was false.

246. The decision maker was not neutral. The officer, Heretick, who presided over the 2013 hearing and who barred Dr. Doe from challenging the 2007 order's foundation, had himself been President of the Board at the time of the 2007 suspension, ruling on the validity of a deprivation in which he had participated without even giving Dr. Doe the opportunity to challenge it. Due process does not tolerate a decision maker sitting in judgment of his own prior act.

247. The post-deprivation process the Defendants now point to was neither prompt nor meaningful. The hearing to which Dr. Doe was statutorily entitled within sixty days of his petition did not occur for more than two years, four years post-deprivation; when it came, it forbade him from contesting the predicate; and the Board's own findings at that hearing, "no evidence of current psychopathology or substance abuse," "safe and competent to resume full independent OB/GYN medicine," confirmed that the deprivation rested on nothing. A post-deprivation remedy that arrives years late, excludes the dispositive issue, and confirms the deprivation was baseless is no remedy at all.

248. The reinstatement process does not provide any mechanism for the challenge of the taking or suspension of a medical license with the burden on the official taking or suspending the

license to prove the basis for the taking or suspension, but instead demands proof of fitness from the physician to regain a different license; one that comes with caveats, a disciplinary record and onerous restrictions.

249. The Defendants compounded the unlawful deprivation by extracting the surrender of Dr. Doe's rights as the price of relief. As conditions of being heard at all, the Board required Dr. Doe to withdraw his pending petition and reapply; to sign broad releases for sensitive personal and medical records the Board could not otherwise have obtained; and to submit to, and pay for, an independent examiner of the Board's choosing, an examiner who, undisclosed to Dr. Doe, was the chief executive of the very monitoring program into which the examination funneled him. The government may not condition the return of a protected interest on the surrender of other constitutional and statutory rights.

250. Having coerced those releases, the Board then used the records it thereby obtained to manufacture "impairment" grounds, characterizations its own evaluators disavowed and which rested on administrative rule-out entries, not on any diagnosis of an actual condition.

251. These deprivations were not isolated to 2007. Because only the Board may convene the special conference committee and hold the proceeding that could correct the record, and because it has refused every request to do so (in 2007, 2011, 2013, 2022, and twice in 2024), Dr. Doe has been held in continuing deprivation, without any forum in which to be heard, for more than nineteen years. When Dr. Doe filed the formal reinstatement petition the Board itself had directed him to file, Virginia Code § 54.1-2409(D) entitled him, as a matter of mandatory command, to a hearing not later than the Board's next regular meeting; that meeting was held on September 13, 2024, and the Board gave him no hearing, then or ever, denying him, in violation of the statute's own terms, any opportunity to be heard on the predicate. Each refusal to hold that proceeding is a fresh denial of process. The Due Process Clause of Article I, § 11 of the Constitution of Virginia is self-executing and operates of its own force; the Commonwealth

therefore owed Dr. Doe process independent of any enabling legislation, and the informal-fact-finding and case-decision procedures Virginia provides, by which a licensee who submits information may obtain a corrected case decision and, if it is adverse, judicial review of it, are the means the Commonwealth supplies to deliver that process. By disabling that machinery and refusing to hold the proceeding it commands, the Defendants denied Dr. Doe the process owed under both the Fourteenth Amendment and the self-executing guarantee of Article I, § 11.

252. The hearing Virginia Code § 54.1-2409(D) commands is not one procedure among several.

253. On the Commonwealth's own account, it is the only process the Commonwealth affords a licensee suspended under § 54.1-2409(A).

254. By withholding it, the Defendants did not merely depart from a state procedure; they withheld the whole of the process the Commonwealth supplies, so that the state system itself worked the deprivation. See Logan v. Zimmerman Brush Co., 455 U.S. 422, 433–36 (1982).

255. The individual Defendants, acting under color of state law, caused these deprivations through their own conduct, with knowledge that no felony conviction existed and with deliberate indifference to Dr. Doe's clearly established rights. The official-capacity Defendants continue the deprivation and may be ordered, by this Court directly rather than by remand to the Board (see Count VII, inf*ra)* to end it.

256. The right to procedural due process is absolute in the sense that it does not depend on the merits of the underlying claim; the denial of that process is itself a completed constitutional injury. Dr. Doe is therefore entitled to relief for the denial of process without regard to whether a constitutionally adequate proceeding might have reached the same result, and the violation is actionable without proof of actual injury. See *Carey v. Piphus*, 435 U.S. 247, 266 (1978).

257. As a direct and proximate result, Dr. Doe has suffered the injuries set forth in paragraphs 191 through 195, for which the individual Defendants are liable in damages and the official-

capacity Defendants are subject to prospective relief, as set forth in the Prayer.

## COUNT III

## Deprivation of Liberty Without Due Process Through False Public Branding Without a Name-Clearing Hearing

**(42 U.S.C. § 1983; U.S. Const. amend. XIV; Va. Const. art. I, § 11)**

258. Dr. Doe realleges and incorporates paragraphs 1 through 257 as if fully set forth herein.

259. The conduct alleged in this Count was committed as follows. Ryals entered, and Lemon issued and published, the April 26, 2007 order branding Dr. Doe a convicted felon, and the Department reported that false characterization to the National Practitioner Data Bank. Harp and Owens authorized and maintained the felony and impairment characterizations in the Defendants' records and reports, and their re-reporting to the Data Bank in 2015, and refused to convene the special conference committee and hold any name-clearing proceeding. Deschenes maintained and acted upon those characterizations in denying Dr. Doe's petitions. And Clements, Marchese, Rathmann, Dave, Ransone, Apel, Vaughan, and John Does 1–50, as members and officers of the Board, refused at each meeting within their eras of service to convene the special conference committee and hold the name-clearing proceeding that the Board alone may convene (including at the September 13, 2024 meeting), at which the members then sitting convened as a panel and approved the reinstatement of other physicians while refusing Dr. Doe any hearing at which he could clear his name, thereby continuing the false felony brand against him from that date forward. Each is sued for his or her own acts and omissions as set forth in the Parties section and the Statement of Facts.

260. Dr. Doe holds a constitutionally protected liberty interest in his reputation, his good name, and his ability to pursue his chosen profession, free of false, stigmatizing charges published by the Commonwealth that foreclose his occupational and other opportunities.

261. The Defendants publicly made stigmatizing statements about Dr. Doe that were false. They branded him a convicted felon when no felony conviction existed; they branded him a substance abuser and an impaired physician when their own evaluators found "no evidence of current psychopathology or substance abuse" and found him "safe and competent to resume full independent OB/GYN medicine." The impairment characterizations rested not on any diagnosis of an actual condition but on administrative rule-out entries, screening notations made to exclude conditions, not to find them, which the Defendants treated as findings of impairment.

262. These were not private determinations. The Defendants published the stigmatizing characterizations to the world: via the public DHP website; to the National Practitioner Data Bank, queried by every hospital, licensing board, and credentialing body in the nation; to the Federation of State Medical Boards and other repositories; and, ultimately, into a publicly available judicial opinion that named Dr. Doe and was in turn republished by a legal-news publication serving the Virginia legal community. The Defendants reported the false felony and impairment characterizations to the Data Bank repeatedly, re-reporting them in June 2015 though they had already been reported and nothing new had occurred, ensuring the false branding remained fresh in the national record even as the characterizations the Colorado court had ordered sealed were pushed into permanent, searchable circulation. The Data Bank reports remain live: the Data Bank discloses them anew to every hospital, licensing board, and credentialing body that queries Dr. Doe, disclosures that recur with each query and that the Defendants alone have the authority to correct or void. And the Defendants have continued to publish the characterizations over their own signatures, in the court filings of April 23, 2024, September 6, 2024, and February 3, 2025 described above, each within the two years preceding this Complaint.

263. The stigma was accompanied by, and inseparable from, a tangible alteration of Dr. Doe's legal status: the suspension and continued suspension of his license to practice medicine. The

false charge and the deprivation of the license are the two halves of a single injury, the Commonwealth did not merely defame Dr. Doe; it defamed him while stripping and withholding the very status the defamation concerned.

264. The falsity caused concrete, real-world harm at the hands of those who relied on it. A hospital at which Dr. Doe could have resumed his established Virginia practice foreclosed that option upon learning of the suspension and understanding him to be a convicted felon. Licensing and bar authorities of other States delayed or closed his applications. Out-of-state medical positions he was qualified for, and forbidden even to pursue, were lost. The branding Defendants published operated exactly as such branding operates: it shut doors wherever it was seen.

265. Dr. Doe has never been afforded a name-clearing hearing. He has demanded one in substance, repeatedly (in 2007, 2011, 2013, 2022, and twice in 2024), and the Defendants have refused at every turn, barring him in limine when they held a hearing at all and refusing to convene the committee or hold any proceeding at which he could clear his name. Because only the Board may hold that proceeding, and it will not, Dr. Doe has been left publicly branded with no mechanism to answer the charge.

266. The deprivation is continuing. Each republication of the false characterizations by the Defendants, and each day they maintain them and refuse the proceeding that would correct them, renews the injury. The 2015 re-report described above, and the 2025 publication of Dr. Doe's identity alongside the felony characterization and its republication weeks later, were each fresh acts of stigmatization; the latter would not exist but for the Defendants' conduct and the characterizations they created, maintained, and refused to correct, which pushed the sealed, dismissed felony brand back into public, searchable circulation.

267. The individual Defendants acted under color of state law, with actual knowledge that the characterizations were false and with deliberate indifference to Dr. Doe's clearly established liberty interest. The official-capacity Defendants continue to publish and maintain the false

characterizations and may be ordered to correct them, to conform their records and disclosures to the truth and to the Colorado sealing order, and to provide the official verification of Dr. Doe's good standing sought herein. To the extent any name-clearing or corrective adjudication is required, Dr. Doe seeks that determination from this Court directly, and not a remand to the Board whose own bias and refusals created and perpetuated the deprivation. (see Count VII, inf*ra)*.

268. Because the Defendants' false characterization of Dr. Doe as a convicted felon is defamatory per se, a false statement injuring him in his profession, it is, by its nature, virtually certain to cause serious injury to reputation and likely to cause mental and emotional distress. Such injury is presumed and is compensable without proof of specific pecuniary loss. See *Carey v. Piphus*, 435 U.S. 247, 262 (1978); *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 349 (1974).

269. As a direct and proximate result, Dr. Doe has suffered the injuries set forth in paragraphs 191 through 195, including the loss of his profession, the foreclosure of opportunities, and grave reputational and personal harm, for which the individual Defendants are liable in damages and the official-capacity Defendants are subject to the corrective and prospective relief set forth in the Prayer.

**COUNT IV**

**Equal Protection – Intentional, Irrational, and Selective Differential Treatment (42 U.S.C. § 1983; U.S. Const. amend. XIV; Va. Const. art. I, § 11)**

270. Dr. Doe realleges and incorporates paragraphs 1 through 269 as if fully set forth herein.

271. The conduct alleged in this Count was committed as follows. Ryals suspended Dr. Doe's license on a predicate the same Director had required actual judgments of conviction to establish for the comparator physicians she suspended days earlier. Harp and Owens maintained the suspension and the impairment characterizations against Dr. Doe even as the Board, over Harp's name, assured every other Virginia physician it would not act on a diagnosis in remission or on

having sought treatment. Deschenes, and Clements, Marchese, Rathmann, Dave, Ransone, Apel, Vaughan, and John Does 1–50, as members and officers of the Board, afforded other respondents informal fact-finding and case decisions to change their orders while denying Dr. Doe that same process and demanding of him alone a reinstatement application the Board's counsel had conceded was unnecessary. Each is sued for his or her own acts and omissions as set forth in the Parties section and the Statement of Facts.

272. The Equal Protection Clause forbids the Commonwealth from intentionally treating one person differently from others similarly situated without a rational basis for the difference, and from administering a facially neutral law unequally and with an evil eye and an unequal hand.

273. The Defendants intentionally treated Dr. Doe differently from physicians similarly situated to him, and from the assurances they gave every other Virginia physician, and there is no rational basis for the difference.

274. The irrationality of the Defendants' classification is confirmed by another licensing authority that examined the identical record. On the same Colorado disposition the Virginia Defendants used to brand Dr. Doe a convicted felon and suspend his license, the Texas Board of Medicine, applying a statute that likewise withholds a license from anyone "convicted of a felony," issued Dr. Doe a visiting-physician license in January 2011 and permitted him to complete a hands-on residency. Two licensing authorities, one record, one materially identical disqualifier: Texas read the record correctly and licensed him; Virginia read a conviction that was not there and suspended him. No rational basis explains why the same record yields a felon in Virginia and a licensed physician in Texas. That no rational basis supports the Defendants' characterization is confirmed by the most exhaustive independent review of Dr. Doe's record ever conducted, which found he had been treated as a convicted felon and a drug addict, neither of which was true, as alleged above.

275. The Board's own records fix the speed at which it acts when it chooses to: nineteen (19)

days to restore a licensee whose out-of-state predicate was cured. Measured against that floor, the over-nineteen-year refusal to afford Dr. Doe any proceeding at all is not delay but design.

276. The Defendants also treated Dr. Doe differently from the way they publicly promised to treat every other Virginia physician. The Board issued a communication to actively licensed Virginia physicians, over the name of its Executive Director, titled "The Board's Perspective on Mental Health Treatment," assuring physicians that the Board would not act against them for having a diagnosis in remission or for seeking treatment, and representing that to do otherwise would violate Title II of the Americans with Disabilities Act and the Rehabilitation Act. The Board did to Dr. Doe precisely what it told every other physician it would not do: it acted against him on the basis of conditions its own evaluators found absent or resolved, and on administrative rule-out entries that were never diagnoses at all. The Board offered no reason, because there is none, for exempting Dr. Doe from the protection it extended to the profession at large.

277. The Defendants further treated Dr. Doe differently from other licensees by denying him a mechanism they afford to others. As a Virginia appellate judge observed, Dr. Doe "petitioned the Board for a new factfinding to exonerate him, just as the Board had done for others in the past," and the Board, rather than convene the informal fact-finding it has convened for others, deflected him to a reinstatement application its own counsel had conceded was unnecessary. The Board has held informal fact-finding proceedings and issued case decisions for other respondents seeking to change an order; it refused that same process to Dr. Doe alone. Indeed, the Board's own counsel conceded in open court that a respondent's written request to change an order "doesn't even have to be termed a petition for modification," and that the Board "has heard cases where the respondent clearly was requesting that an order be changed, and the Board reviewed it as a petition for modification and instituted informal fact-finding proceedings and then issued a case decision." The Board afforded that informal path to other respondents while demanding of Dr. Doe, as a precondition to any decision, a formal reinstatement application it knew to be

unnecessary.

278. The differential treatment was intentional and purposeful. The Defendants suspended and continued the suspension of Dr. Doe's license, and refused him the processes afforded to others, with actual knowledge that no felony conviction existed and that their own findings refuted the impairment characterizations. The disparity was not the product of error or oversight but of a sustained, deliberate course of conduct singling Dr. Doe out for treatment afforded to no one similarly situated.

279. No legitimate governmental interest is rationally served by the difference. The asserted interest, protecting the public from a convicted felon or an impaired physician, is wholly absent here, because Dr. Doe is neither, as the Defendants' own records establish. A classification that rests on a fact the classifying body knows to be false serves no rational end; it serves only to perpetuate the Defendants' original error and to insulate it from correction.

280. The individual Defendants, acting under color of state law, intentionally caused this differential treatment with deliberate indifference to Dr. Doe's clearly established right to equal protection. The official-capacity Defendants continue it and may be ordered, by this Court directly, to cease it and to afford Dr. Doe the equal treatment and processes afforded to others similarly situated.

281. As a direct and proximate result, Dr. Doe has suffered the injuries set forth in paragraphs 191 through 195, for which the individual Defendants are liable in damages and the official-capacity Defendants are subject to the prospective relief set forth in the Prayer.

## COUNT V

### Denial of Access to the Courts
### (42 U.S.C. § 1983; U.S. Const. amends. I & XIV; Va. Const. art. I, § 11)

282. Dr. Doe realleges and incorporates paragraphs 1 through 281 as if fully set forth herein.

283. The conduct alleged in this Count was committed as follows. The Board, through Deschenes and the staff and members then serving, withheld the agency record of Dr. Doe's 2013 appeal for more than three years, preventing that appeal from proceeding, while representing to the federal court that the state remedy was available, a representation Barrett advanced to obtain abstention, having herself propagated the in limine ruling that barred Dr. Doe from raising his claims. Harp and Owens maintained that obstruction. And Clements, Marchese, Rathmann, Dave, Ransone, Apel, Vaughan, and John Does 1–50, as members and officers of the Board with the authority and the duty to convene the committee, to hold the proceeding, and to vote to do so (the proceeding that alone could yield a reviewable decision), refused to do so at each meeting within their eras of service, including the September 13, 2024 meeting at which the members then sitting held a hearing to reinstate other physicians while affording Dr. Doe no hearing and no reviewable case decision. Each is sued for his or her own acts and omissions as set forth in the Parties section and the Statement of Facts.

284. The right of access to the courts, secured by the First and Fourteenth Amendments, guarantees a person a reasonable and meaningful opportunity to present a nonfrivolous claim to a tribunal. That right is violated when state officials, by their own affirmative acts and deliberate omissions, foreclose or render futile the litigation of such a claim.

285. Dr. Doe had, and has, a nonfrivolous claim of fundamental importance: that the 2007 order suspending his license was entered without statutory authority, is void ab initio, and has deprived him of his profession for nineteen years. The Defendants have, by a sustained course of conduct, foreclosed every avenue by which Dr. Doe could obtain a decision on that claim.

286. First, the Defendants blockaded the one appeal Dr. Doe was able to take. When Dr. Doe timely appealed the 2013 order to the circuit court, the Defendants, who alone possessed and controlled the agency record, refused for more than three years to transmit it, although Rule 2A:3(b) commanded them to transmit it "as soon as practicable." The circuit court advised Dr.

Doe that it would entertain no motion, including a motion to compel, until it received the record. By withholding the record, the Defendants prevented Dr. Doe's appeal from proceeding at all.

287. Second, the Defendants weaponized their own blockade. Having withheld the record for three years and thereby stalled the state appeal, the Defendants represented to the federal court that the state proceeding was available and ongoing, and obtained a dismissal of Dr. Doe's federal action on abstention grounds, and then, days after the federal court abstained, transmitted the long-withheld record to belatedly furnish the very proceeding they had told the federal court was already available. The Defendants thus used the obstruction they had created to defeat Dr. Doe in both forums: no state review because they withheld the record, and no federal review because they represented that state review was available.

288. Third, the Defendants have foreclosed the only remaining avenue by which Dr. Doe could obtain a reviewable decision. Under Virginia law, the deprivation Dr. Doe suffers can be corrected only through a proceeding the Board alone may convene and hold, and a licensee aggrieved by a § 54.1-2409 suspension has no appealable "case decision" to challenge, as the Defendants themselves have repeatedly and successfully maintained. That no appeal exists is not Dr. Doe's characterization but the Commonwealth's own: it has told the courts that a § 54.1-2409 suspension "is not appealable" and is "not [a] case decision" subject to review, its standard notice advises every suspended physician of reinstatement alone, and its 2007 order, unlike a true post-hearing case decision carried no appeal advisement at all. See ¶ 206. The avenue the Commonwealth says never existed cannot be the avenue Dr. Doe forfeited.

289. Dr. Doe has petitioned the Board to convene the committee and hold that proceeding and to issue a case decision (in 2007, 2011, 2013, 2022, and twice in 2024), invoking the informal-fact-finding process and the ninety-day decision requirement of Virginia Code § 2.2-4021(B). The Board has refused each time, most recently by demanding, as a precondition to any decision, a reinstatement application its own counsel had conceded in open court was unnecessary. Dr.

Doe used the very mechanism the Board directed him to use, the formal reinstatement application Deschenes enclosed and instructed him to submit, and the Board, bound by § 54.1-2409(D) to hear him at its next meeting, neither heard him nor responded. The avenue the Board itself prescribed proved as closed as every other. The result is a closed loop: no appealable order exists, and the Board will not convene the proceeding that would produce one, so there is no decision for any court to review, and no door Dr. Doe can open from the outside.

290. The Defendants cannot have the closed loop both ways. To defeat Dr. Doe's appeals, the Defendants maintained, and the courts accepted, that a § 54.1-2409 suspension is a ministerial act and "not a case decision" subject to review, so that there was nothing for Dr. Doe to appeal. To defeat Dr. Doe's petition for a writ of mandamus, the Defendants maintained the opposite, that the same act was a discretionary, "quasi-judicial" exercise of "judgment" not subject to mandamus, and prevailed on that too. Having advanced and prevailed on each position as it suited them, the Defendants are estopped from asserting whichever now defeats Dr. Doe's access to a remedy. *New Hampshire v. Maine*, 532 U.S. 742, 749–51 (2001); *Lowery v. Stovall*, 92 F.3d 219, 223–24 (4th Cir. 1996). On either of the Defendants' characterizations, Dr. Doe is left with no forum: if the act is ministerial and not a case decision, there is nothing to appeal and the Board must correct it; if it is discretionary and quasi-judicial, it was an adjudication of his status rendered with no notice, hearing, or record.

291. The Defendants' conduct was deliberate and purposeful. They withheld the record intentionally and for strategic advantage; they represented the availability of a state remedy they were simultaneously obstructing; and they have refused, for more than nineteen years, to convene the committee and hold the only proceeding that could yield a reviewable decision, with knowledge that no felony conviction exists and with deliberate indifference to Dr. Doe's right to be heard. The obstruction is ongoing: each continued refusal to convene the proceeding renews the denial of access.

292. As a direct and proximate result, Dr. Doe lost the ability to obtain timely review of the deprivation of his license and has been relegated, after nineteen years of foreclosed avenues, to this action. What the obstruction took cannot be restored by any judgment now: the 2013 appeal the Defendants blockaded was lost; the years of licensure, practice, income, and board certification between the blockade and today are gone; and no adjudication this Court can render will return them. The relief available in this action redresses the deprivation prospectively and in damages; it does not and cannot supply the timely review the Defendants foreclosed. Dr. Doe has suffered the injuries set forth in paragraphs 191 through 195. The individual Defendants are liable in damages, and the official-capacity Defendants are subject to prospective relief, including an order that this Court adjudicate the validity of the 2007 order directly rather than remand to the Board, as set forth in the Prayer and in Count VII.

**COUNT VI**

**Denial of Full Faith and Credit to the Judgments of a Sister State**
**(U.S. Const. art. IV, § 1; 28 U.S.C. § 1738; 42 U.S.C. § 1983)**

293. Dr. Doe realleges and incorporates paragraphs 1 through 292 as if fully set forth herein.

294. The conduct alleged in this Count was committed as follows. With knowledge of the Colorado court's dismissal of the felony charge and of its October 9, 2019 order sealing the underlying records, Harp and Owens maintained and published the contrary felony characterization and declined to conform the Defendants' records, reports, and disclosures to the Colorado judgments. Deschenes refused the express request, in Dr. Doe's 2022 and 2024 petitions, that the Board accord those judgments full faith and credit and sequester the sealed information. And Clements, Marchese, Rathmann, Dave, Ransone, Apel, Vaughan, and John Does 1–50, as members and officers of the Board, refused at each meeting within their eras of service to convene the special conference committee and hold the proceeding through which that recognition could be afforded, including at the September 13, 2024 meeting, at which the

members then sitting held proceedings to reinstate other physicians while refusing to convene any proceeding through which the Colorado judgments could be accorded full faith and credit and the sealed, dismissed felony characterization conformed to those judgments. Each is sued for his or her own acts and omissions as set forth in the Parties section and the Statement of Facts.

295. The Full Faith and Credit Clause and 28 U.S.C. § 1738 require the Commonwealth of Virginia, and its officers, to accord the judicial proceedings of a sister State the same force and effect they have in the State that rendered them. That obligation is "exacting" as to a final judgment rendered by a court with jurisdiction over the subject matter and the parties. See *Baker v. General Motors Corp.*, 522 U.S. 222, 233 (1998). Full faith and credit is not confined to final judgments. A State also violates the Clause when it adopts a construction of a sister State's law that contradicts that law where it is clearly established and has been brought to the court's attention. See *Sun Oil Co. v. Wortman*, 486 U.S. 717, 730–31 (1988). Virginia did exactly that: presented with Colorado's deferred-judgment statute and with *Weber v. Colo. State Bd. of Nursing*, 830 P.2d 1128, 1133 (Colo. App. 1992), the Defendants and the courts that credited them construed a completed Colorado diversion as a felony conviction, a construction Colorado law forecloses. Moreover, once diversion was certified complete, the Colorado court had no discretion: by operation of statute the guilty plea was withdrawn and the felony charge dismissed with prejudice. A disposition the rendering court cannot modify is, for full-faith-and-credit purposes, the equivalent of a final judgment and entitled to the same exacting recognition. See *Barber v. Barber*, 323 U.S. 77, 86 (1944) (according full faith and credit to a decree fixing an amount no longer subject to the rendering court's modification).

296. The courts of Colorado, the only courts with jurisdiction over the underlying criminal matter, rendered two judgments that control Dr. Doe's status. First, upon Dr. Doe's completion of diversion on March 16, 2007, his guilty plea was withdrawn and the felony charge was dismissed by operation of Colorado law, and the Colorado court entered a formal order of dismissal with

prejudice on August 19, 2008. Under Colorado law, Dr. Doe stood convicted of no felony. Second, on October 9, 2019, the Colorado court ordered, pursuant to Colorado Revised Statutes § 24-72-706, that the records relating to the matter "be sealed immediately," upon the court's finding that Dr. Doe "has not been convicted of a criminal offense since the date of the final disposition of all criminal proceedings," and directed that upon any inquiry "the person in interest and criminal justice agencies to which this Order is directed may properly reply that public conviction records do not exist with respect to the defendant."

297. Those judgments are entitled to full faith and credit in Virginia. The first establishes, as a matter of Colorado law binding on Virginia, that no felony conviction exists. The second establishes, as a matter of Colorado law binding on Virginia, that the records of the matter are sealed and that, on inquiry, the lawful answer is that no public conviction record exists. Colorado law forecloses the very use the Defendants have made of the matter: a professional licensing board may not treat a completed deferred judgment as a conviction. See *Weber,* 830 P.2d at 1133.

298. The Defendants have refused to accord those judgments the effect Colorado gives them. With knowledge of the Colorado dismissal and of the 2019 sealing order, the Defendants have continued to characterize Dr. Doe as a convicted felon, to maintain and publish that characterization in their orders, records, and reports, and to decline to conform their records and disclosures to the sealing order, giving the Colorado judgments not the effect they carry in Colorado, but no effect at all. When Dr. Doe expressly asked the Board, in his 2024 petition, to "accord Full Faith and Credit" to the sealing order and to sequester the sealed information, the Board refused to act by not acting at all.

299. The Defendants' refusal is not a permissible exercise of any exception to full faith and credit. The Colorado judgments were rendered by courts of competent jurisdiction, on the merits of the disposition, and the Defendants do not, and cannot, contend otherwise. Virginia may not

decline to recognize a sister-State judgment merely because its officers prefer a contrary characterization or because recognition would unwind their own prior error.

300. Dr. Doe does not ask this Court to order Virginia to alter the records of another State. He asks that the Defendants be required to give the Colorado judgments the legal effect Colorado gives them: to cease treating as a conviction a matter that Colorado has dismissed and sealed, to cease publishing and maintaining the contrary characterization, to conform their own records, reports, and responses to inquiry to the sealing order, and to refrain from disclosing the sealed information in a manner Colorado forbids.

301. The refusal is continuing and was undertaken under color of state law, with knowledge of the Colorado judgments and with deliberate indifference to Dr. Doe's right to their recognition. Each continued publication of the dismissed-and-sealed characterization, and each refusal to conform to the sealing order, renews the violation.

302. As a direct and proximate result, Dr. Doe has suffered the injuries set forth in paragraphs 191 through 195, including the perpetuation and public dissemination of a felony characterization that Colorado has dismissed and sealed. The individual Defendants are liable in damages, and the official-capacity Defendants are subject to the prospective and corrective relief set forth in the Prayer, including an order directing them to accord the Colorado judgments full faith and credit and to conform their records, reports, disclosures, and the publications within their control to the sealing order.

## COUNT VII

### Declaratory Judgment – The 2007 Order and Its Progeny Are Void Ab Initio

### (28 U.S.C. §§ 2201–2202; Ex parte Young; U.S. Const. amend. XIV; Action Without Statutory Authority)

303. Dr. Doe realleges and incorporates paragraphs 1 through 220 as if fully set forth herein.

304. An actual, justiciable, and continuing controversy exists between Dr. Doe and Defendants Brown and Harp, in their official capacities, concerning the validity of the April 26, 2007 suspension order and of every Board order, directive, report, and other action derived from it, and concerning the foundation of every subsequent proceeding that rested upon it. Dr. Doe contends the 2007 order was entered without statutory authority and is void ab initio, and that everything built upon it is, to the extent of that dependence, without legal foundation; those Defendants contend the order is valid and continue to give it effect. The controversy is definite and concrete, and a declaration will resolve it.

305. The declaration sought in this Count is antecedent to and in aid of Dr. Doe's federal claims. The continued enforcement of the 2007 order, and of the orders, reports, and characterizations derived from it, is the ongoing deprivation of federal rights from which prospective relief is sought against Defendants Brown and Harp under Ex parte Young.

306. Whether the predicate on which the Director's authority depended existed is a question this Court decides as an element of those federal claims, in the same way it decides whether a property interest exists or whether a duty was ministerial. It is not a request that this Court order the Defendants to conform their conduct to state law.

307. Virginia Code § 54.1-2409(A) conferred no general power to suspend a license. It conferred a single, conditional power: "[u]pon receipt of documentation by any court or government agency that a person … has … been convicted of a felony," the Director "shall immediately suspend, without a hearing," the license "of any person so … convicted." The statutory predicate, documentation of an actual felony conviction, was both the trigger for the Director's authority and the entire measure of it. Absent that predicate, the Director had no power to act.

308. The General Assembly captioned § 54.1-2409 "Mandatory Suspension," and its command is ministerial, not adjudicative. A ministerial act is one "perform[ed] in obedience to a

legal mandate and in a prescribed manner, without regard to his own judgment as to the propriety of the act to be done," *Howell v. McAuliffe*, 292 Va. 320, 351 (2016), and a "'shall' command in a statute always means 'shall,' not 'may,'" *Bland-Henderson v. Commonwealth*, 303 Va. 212, 218 (2024) (quoting *Rickman v. Commonwealth*, 294 Va. 531, 537 (2017)); see *Mettetal v. Va. Bd. of Med*., 83 Va. App. 182, 189 (2024) (describing the § 54.1-2409 suspension as "required … without a hearing"). Ascertaining the predicate fact is part of that ministerial duty, not a grant of adjudicative discretion: "a duty is no less ministerial … because an officer has to determine the existence of the facts which make it necessary for him to act." *Bd. of Cnty. Supervisors v. Hylton Enters., Inc*., 216 Va. 582, 584 (1976). When the predicate fact does not exist, the duty never triggers and no authority attaches.

309. Subsection (C) confirms the design by negative implication. It is triggered only "[w]hen a conviction has not become final," and affords the Director nothing more than a timing option to await finality, presupposing throughout that a conviction exists. Subsection (A) is thus reserved for adjudicated, final convictions; it is no vehicle for an executive officer's own finding of guilt. Because no conviction (final or otherwise) ever existed, the predicate on which the Director's entire authority depended was absent, and the suspension was action without authority.

310. The predicate did not exist. As alleged above, no judgment of conviction ever entered against Dr. Doe; by operation of Colorado law his guilty plea was withdrawn and the felony charge dismissed upon his completion of diversion on March 16, 2007, forty-one days before the suspension. A guilty plea is not a conviction. See *Starrs v. Commonwealth*, 287 Va. 1, 12–13 (2014). The certified Colorado record in the Director's own hands documented a deferred disposition and an entered sentence on the misdemeanor counts alone, no felony conviction. The Commonwealth's own application of the statute confirms the point. Days before Dr. Doe's suspension, the same Director suspended another physician who had also pleaded guilty, but who had then been adjudicated guilty and sentenced on a Judgment in a Criminal

Case, which the Director recited and attached. Dr. Doe pleaded guilty too; the difference, and the dispositive one, is that Dr. Doe was never adjudicated guilty, never sentenced, and no judgment ever entered, his plea was withdrawn and the charge dismissed. A guilty plea is not a conviction; the Director attached a judgment of conviction when one existed, and attached none to Dr. Doe's order because none existed. By the Commonwealth's own later description, the Director acted on Dr. Doe's having "pled guilty," not on any conviction.

311. The Director nonetheless suspended Dr. Doe's license, reciting a felony conviction that the documentation before her refuted. In doing so she acted upon something the statute does not authorize: not "documentation … that [a] person … has … been convicted of a felony," but documentation of a guilty plea and a deferred judgment, recharacterized (erroneously) as a conviction. The statute does not reach a plea, a deferral, or an official's mistaken conclusion that one of those amounts to a conviction. To read it to reach any of those is to rewrite it, supplying predicates the General Assembly did not enact and converting a narrow, conditional command into a general license to suspend on error. Where the legislature uses distinct terms, they are presumed to carry distinct meanings, *Klarfeld v. Salsbury*, 233 Va. 277, 284 (1987), and supplying the missing terms is legislation, not construction, Va. Const. art. III, § 1; art. IV, § 1.

312. Because the sole condition on the Director's authority was never met, the 2007 order was not a valid order tainted by error. It was an act in excess of the authority the statute conferred, ultra vires, and therefore void ab initio: a nullity from the moment it issued, of no legal force, and subject to challenge at any time and in any proceeding in which its validity is at issue.

313. The Defendants themselves have described the Director's authority in precisely these terms. In the action underlying this Complaint, they characterized § 54.1-2409 as having "expressly authorized and indeed required the then-Director … to mandatorily suspend" Dr. Doe's license, and for years have described the act as one the Director "must" and was "ordered by statute" to take upon the requisite documentation. A power that is "required," "mandatory,"

and conditioned on a statutory predicate is not a discretion to find facts or to act where the predicate is absent; on the Defendants' own characterization, the existence of a felony conviction was the indispensable condition of the Director's authority, and its absence left her without any.

314. Every Board order, directive, and report that followed depended on the 2007 order. The Board never initiated any independent disciplinary proceeding against Dr. Doe and never invoked its own summary-suspension authority under Virginia Code § 54.1-2408.1; every proceeding it convened was a reinstatement proceeding that presupposed the validity of the 2007 suspension. The 2011 and 2013 orders did not reinstate Dr. Doe's license through any independent adjudication; each "continued" the 2007 suspension, and each rested on the predicate felony conviction the 2007 order had asserted. An order built upon a void order is itself void to the extent of that dependence. The Defendants themselves have so characterized their conduct: they have repeatedly described their actions arising from the 2007 suspension, through the proceedings and the reviews that followed, as a single, continuous unit, each element of which depends on the validity of the 2007 order. And the state-court rulings the Defendants invoke supplied no independent foundation: each disposed of Dr. Doe's challenges on threshold grounds and on the Defendants' own characterizations, without adjudicating whether the predicate existed, and none supplies a basis for the suspension that the void order itself lacks.

315. That a void order may be challenged without regard to any limitations period is not disputed in this litigation. The Court of Appeals acknowledged the governing rule that a void order "may be attacked 'in any valid direct or collateral proceeding where the voidness of the order is properly at issue,'" and that "no statute of limitations can bar an action asserting that an order is void ab initio." A judgment void ab initio is a complete nullity; no lapse of time can give it life.

316. Dr. Doe has no adequate remedy at law. Only the Board may hold the proceeding that could correct the record, and it has refused to do so; the Defendants continue to enforce and to

publish the void order and its characterizations; and the deprivation renews each day it persists. Dr. Doe has sought correction directly from the Board, most recently by the formal reinstatement petition the Board itself directed him to file in June 2024, limited to the single issue of the nonexistent felony predicate, and the Board has refused to act, leaving the void order in force and the controversy unresolved. A declaration of voidness is necessary to resolve the controversy and to establish the predicate for the further relief sought in this Complaint.

317. Complete relief lies with this Court directly, and not in a remand to the Board. Where the body whose action is challenged is itself compromised, a reviewing court may decline to remand, because that body "could not be expected, upon remand, to make an unbiased decision." *Va. Bd. of Med. v. Fetta*, 12 Va. App. 1173, 1177, 408 S.E.2d 573, 576 (1991). The Board's nineteen-year pattern of refusing to hold any proceeding at which Dr. Doe could be heard, and its repeated insistence on the felony characterization its own record refutes, place it squarely within that rule. Dr. Doe therefore seeks the declarations, corrections, and other relief set forth below from this Court, to be carried out by Defendants Brown and Harp within the authority of their offices. Accordingly, Dr. Doe is entitled, as against Defendants Brown and Harp in their official capacities, to relief pursuant to 28 U.S.C. §§ 2201 and 2202 as follows:

i. a declaration that the April 26, 2007 order, and each Board order, directive, report, and other action derived from it, was entered without statutory authority, is ultra vires, and is void ab initio, together with an injunction prohibiting those Defendants from giving the 2007 order or any order, directive, report, or action derived from it any further effect;

ii. a declaration that, because the 2007 order is void, every subsequent Board proceeding, order, directive, and report that rested upon it derived from a nullity and supplies no independent basis for Dr. Doe's continued suspension or for the characterizations published against him; that no proceeding, order, or ruling has ever adjudicated the existence of the felony predicate on which the 2007 order recites that it rests, so that none

supplies an independent basis for either; and an injunction prohibiting those Defendants from continuing to treat any such proceeding or ruling as a basis for his suspension or for those characterizations;

iii. an injunction directing those Defendants, within the authority of their offices, to correct, withdraw, or rescind the records, reports, and publications that perpetuate the void order's effect, including the National Practitioner Data Bank report, any report or data furnished to the Federation of State Medical Boards or to any other licensing, credentialing, or data repository, and the Defendants' own records and responses to inquiries concerning Dr. Doe;

iv. an injunction directing those Defendants to take the steps within their authority to conform every such record and publication to the October 9, 2019 sealing order of the Colorado court, including by according that order full faith and credit, by sequestering the sealed information and declining to disclose it on inquiry consistent with that order, and by joining or filing, in any proceeding in which they are parties, motions to seal, redact, or substitute a pseudonym for Dr. Doe's identity in any opinion, order, or record that publishes the void characterizations, as further sought in Count VI;

v. an injunction directing Defendants Brown and Harp, in their official capacities and as to their successors in office, to issue, upon Dr. Doe's request, written verification, to any government, licensing, or credentialing authority, immigration authority, employer, or other entity, that Dr. Doe's status with the Board and the Department is in good standing; that the April 26, 2007 order and the orders, directives, reports, and characterizations derived from it have been adjudged void ab initio and of no legal effect; and that no residual statement, report, or publication reciting the void characterizations carries any official validity, in a form suitable for submission to authorities within and outside the United States;

vi. an injunction directing those Defendants to provide the verifications and confirmations of good standing necessary to facilitate Dr. Doe's restoration of his American Board of Obstetrics and Gynecology certification and any other professional credential lost as a consequence of the unlawful suspension, and not to oppose such restoration; and

vii. an injunction directing those Defendants, upon Dr. Doe's request, to furnish a certified statement that the void records and characterizations have been sealed, corrected, or adjudged void, in a form Dr. Doe may submit in any proceeding in which those records or characterizations are at issue, and prohibiting those Defendants from opposing or undermining the sealing or redaction of their own void records wherever those records appear; and

viii. all further relief, necessary or proper, to which Dr. Doe may be entitled based on the foregoing declaratory judgment.

**COUNT VIII**

**Discrimination in Violation of Title II of the Americans with Disabilities Act**
**(42 U.S.C. § 12131 et seq.)**

318. Dr. Doe realleges and incorporates paragraphs 1 through 317 as if fully set forth herein.

319. Title II of the Americans with Disabilities Act provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132.

320. The Department of Health Professions and the Board of Medicine are public entities within the meaning of Title II. The licensing of physicians, and the administration of the monitoring and reinstatement processes attendant to licensing, are services, programs, or activities of those public entities.

321. Dr. Doe is a qualified individual with a disability within the meaning of the Act. He is a physician fully qualified to practice medicine, as the Defendants' own evaluators repeatedly found. He is an individual with a disability because the Defendants regarded him as having a mental or physical impairment, and because they acted on a record of such an impairment, characterizing him as an impaired physician unable to practice with reasonable skill and safety, and maintaining that characterization in their orders, records, and reports, notwithstanding their own findings of "no evidence of current psychopathology or substance abuse" and that he was "safe and competent to resume full independent OB/GYN medicine."

322. The Defendants regarded Dr. Doe as disabled and acted on that perception. They predicated their treatment of him on a purported "extensive history of mental illness" drawn from administrative rule-out entries, screening notations made to exclude conditions, not to find them, and on the fact that he had at one time received disability benefits, treating a history of seeking or receiving care as itself a disqualifying impairment. They did so even as they assured every other Virginia physician, in writing, that the Board would not act against a physician for a diagnosis in remission or for having sought treatment, and that to do so would violate Title II of the ADA and the Rehabilitation Act.

323. By reason of that perceived or recorded disability, the Defendants discriminated against Dr. Doe in the administration of their licensing program. They conditioned the return of his license on enrollment in a monitoring program premised on an impairment he did not have; they required him to submit to, and pay for, repeated evaluations directed at a condition their evaluators had already excluded; they imposed monitoring terms that forbade him from working in any capacity, leaving the Commonwealth, or contacting prospective employers; and they continued to brand and publish him as impaired. Each of these actions excluded Dr. Doe from, and discriminated against him in, a service or program of a public entity by reason of disability.

324. The discrimination was intentional, or in deliberate indifference to Dr. Doe's federally protected rights. The Defendants acted with knowledge that their own evaluations had found no current impairment and that the impairment characterization was false, yet imposed disability-based conditions and published disability-based characterizations anyway.

325. Under the Board's own 2011 order, the sole condition on which Dr. Doe's license would be restored was his entry into a monitoring contract premised on an impairment the Board's own evaluators had excluded, and the Board has never identified any other condition of restoration.

326. The suspension as the Defendants maintain it today is therefore itself a disability-based condition.

327. Each refusal to remove that condition, on petitions that invoked this Act by name, is a present exclusion by reason of a perceived or recorded disability, not merely a refusal to reconsider the felony predicate.

328. The discrimination is continuing. Only the Board may convene the committee and hold the proceeding that could end the disability-based conditions and correct the disability-based characterizations, and it has refused every request to do so. Dr. Doe petitioned the Board to exonerate him and to conform its treatment of him to the ADA and the Rehabilitation Act in May 2022, and again on February 7, 2024, the latter petition expressly invoking the Act, the Board's own published ADA guidance, and Dr. Doe's protected status, and yet again in June 2024, to which he was statutorily entitled to a hearing in September 2024, and the Board has renewed that refusal at each regular meeting and special conference committee it has convened since, including within the year preceding this Complaint, without hearing Dr. Doe. The Board refused each petition, and each refusal to hold the corrective proceeding it alone controls, and each continued day of imposing and publishing the disability-based characterizations, is a fresh act of discrimination. The violation therefore continues to the present and renews each day the Defendants decline to act.

329. Sovereign immunity does not bar this claim. To the extent Dr. Doe's Title II claim rests on conduct that also violates the Fourteenth Amendment, including the deprivation of his property and liberty interests without due process and the denial of equal protection, Congress validly abrogated state sovereign immunity, and the claim may proceed against the public-entity Defendants. See *United States v. Georgia*, 546 U.S. 151 (2006).

330. As a direct and proximate result of the Defendants' discrimination, Dr. Doe has suffered the injuries set forth in paragraphs 191 through 195, including the loss of his profession and income. Dr. Doe is entitled to the remedies available under Title II, including compensatory and consequential damages for his pecuniary losses, his lost income, his lost professional opportunities, the loss of his personal and professional property, and the costs and expenses the Defendants' discrimination forced him to bear, injunctive relief requiring the cessation of the discriminatory conditions and the correction of the discriminatory records and characterizations, reasonable attorney's fees and costs under 42 U.S.C. § 12205, and the further relief set forth in the Prayer.

**COUNT IX**

**Discrimination in Violation of Section 504 of the Rehabilitation Act**
**(29 U.S.C. § 794)**

331. Dr. Doe realleges and incorporates paragraphs 1 through 330 as if fully set forth herein.

332. Section 504 of the Rehabilitation Act provides that no otherwise qualified individual with a disability shall, solely by reason of such disability, be excluded from participation in, denied the benefits of, or subjected to discrimination under any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a).

333. The Department of Health Professions is a department of the government of the Commonwealth of Virginia, and the Board of Medicine is a unit within it.

334. The Department receives federal financial assistance. Among other streams, the

Appropriation Act authorizes the Department to transfer program revenues to the Department of Medical Assistance Services for use as the Commonwealth's Medicaid match, drawing down federal funds that reimburse the Department for its program expenditures, and the Department's Director executes the agreements under which the Department administers federally supported functions. See Va. Code § 54.1-2505.

335. In the 2015 action in this Court, the Department's receipt of federal financial assistance was not disputed by the Defendants.

336. Under 29 U.S.C. § 794(b)(1)(A), all of the operations of the Department and of the Board, including the licensing, reinstatement, monitoring, and disciplinary functions at issue in this Complaint, are a "program or activity" within the meaning of Section 504.

337. By accepting that assistance, the Department and the Board are bound by Section 504 and have waived sovereign immunity from suit under it. See 42 U.S.C. § 2000d-7.

338. Dr. Doe is an otherwise qualified individual with a disability within the meaning of Section 504, as defined coextensively with the Americans with Disabilities Act. He is fully qualified to practice medicine, as the Defendants' own evaluators found; and he is an individual with a disability because the Defendants regarded him as having a mental or physical impairment and acted on a record of such an impairment, as alleged in Count VIII.

339. The Defendants discriminated against Dr. Doe solely by reason of that perceived or recorded disability. They conditioned the return of his license on monitoring premised on an impairment he did not have; required him to submit to and pay for repeated evaluations directed at a condition their evaluators had already excluded; imposed monitoring terms forbidding him from working in any capacity, leaving the Commonwealth, or contacting prospective employers; and branded and published him as an impaired physician, all on the basis of a "history" of impairment drawn from administrative rule-out entries and from the fact that he had sought or received care, and all in contradiction of the Defendants' own written assurance to other

physicians that such action would violate the Rehabilitation Act and the ADA. These disability-based conditions and characterizations were imposed because the Defendants regarded Dr. Doe as impaired and acted on a record of impairment, independent of and in addition to the felony predicate: the monitoring, the repeated evaluations, and the impairment branding rested on the Defendants' own characterization of him as impaired, and were imposed and maintained on that basis alone, regardless of the felony question. The perceived or recorded disability was thus itself a sufficient and operative cause of the discrimination.

340. The discrimination was intentional, or undertaken in deliberate indifference to Dr. Doe's federally protected rights, the Defendants having acted with knowledge that their own evaluations found no current impairment and that the impairment characterization was false.

341. The discrimination is continuing, on the same facts alleged as to Count VIII. Only the Board may convene the committee and hold the proceeding that could end the disability-based conditions and correct the disability-based characterizations, and it has refused every request to do so, most recently the petitions of May 2022, February 7, 2024, and June 2024, the last entitling Dr. Doe to a hearing in September 2024 that was not held, and it has renewed that refusal at each meeting since, without hearing Dr. Doe. Each refusal to hold the corrective proceeding it alone controls, and each continued day of imposing and publishing the disability-based characterizations, is a fresh act of discrimination renewing the violation to the present.

342. As a direct and proximate result, Dr. Doe has suffered the injuries set forth in paragraphs 191 through 195, including the loss of his profession, his income, and his board certification. Dr. Doe is entitled to the remedies available under Section 504, including compensatory and consequential damages for his pecuniary losses, his lost income, his lost professional opportunities, the loss of his personal and professional property, and the costs and expenses the Defendants' discrimination forced him to bear, injunctive relief requiring the cessation of the discriminatory conditions and the correction of the discriminatory records and characterizations,

an order directing the Defendants to provide the verifications and confirmations of good standing necessary to facilitate restoration of Dr. Doe's board certification and other lost credentials and not to oppose such restoration, reasonable attorney's fees and costs under 29 U.S.C. § 794a, and the further relief set forth in the Prayer.

## COUNT X

### Damages Under 42 U.S.C. § 1983 – Compensatory and Punitive (Individual Defendants in Their Individual Capacities)

343. Dr. Doe realleges and incorporates paragraphs 1 through 342 and the attribution paragraphs of Counts II through VI as if fully set forth herein.

344. The conduct alleged in this Count was committed by the individual Defendants as set forth in Counts II through VI and the Statement of Facts. Ryals entered the void 2007 order, issued and published by Lemon under her direction; Harp and Owens maintained and enforced it and authorized the false characterizations and their republication; Deschenes denied the petitions, demanded the unnecessary reinstatement application, and withheld the appeal record; and Clements, Marchese, Rathmann, Dave, Ransone, Apel, Vaughan, and John Does 1–50, as members and officers of the Board with the authority and the duty to convene the special conference committee, to hold the proceeding, and to vote to do so, refused to do so at each meeting within their respective eras of service. Silverman, Ryals, Banning, Lemon, Barrett, Heretick, Stewart, Hopson-Bush, Dixson, Kammerer, and Wood are named for their conduct as actors but are not sued as defendants in this action. Each individual Defendant is sued for his or her own acts and omissions.

345. At all relevant times the individual Defendants acted under color of state law. By the conduct alleged above, they deprived Dr. Doe of rights secured by the Constitution and laws of the United States, including his rights to procedural due process, to be free of stigmatizing

deprivation of liberty without a name-clearing hearing, to equal protection of the laws, and to meaningful access to the courts, for which 42 U.S.C. § 1983 affords a remedy in damages.

346. Each individual Defendant personally participated in, directed, or, having the authority and duty to act, acquiesced in the deprivations alleged. The 2007 order that suspended Dr. Doe's license on a felony conviction that did not exist was entered by Sandra Whitley Ryals, then Director. Deschenes, Harp, and the remaining individual Defendants each took the specific actions attributed to them above: continuing the suspension on the void predicate, barring Dr. Doe from contesting it, coercing the releases used to manufacture impairment grounds, filing and maintaining the false report, and refusing the proceedings that would correct the record.

347. The individual Defendants are not shielded by qualified immunity. The rights they violated were clearly established at the time: that a protected property and liberty interest may not be taken without notice and a meaningful opportunity to be heard on the dispositive fact; that the government may not publicly brand a person with a false and stigmatizing charge while stripping his professional status, without a name-clearing hearing; that it may not single a person out for differential treatment on a fact it knows to be false; that it may not, through the only process it affords, hold a person's property indefinitely by ensuring that no decision is ever made; and that it may not obstruct access to the courts. No reasonable official could have believed that suspending and continuing the suspension of a physician's license on a felony conviction the official knew did not exist, and then foreclosing every avenue to correct it, was lawful.

348. Nor are the individual Defendants shielded by absolute or quasi-judicial immunity. The conduct for which they are sued was not the exercise of any adjudicative function. Entering a suspension the statute commanded "without a hearing"; maintaining and republishing records the Defendants knew to be false; reporting Dr. Doe to the National Practitioner Data Bank on no reportable event; demanding a reinstatement application the Board's own counsel had conceded was unnecessary; and refusing, meeting after meeting, to convene the committee, to hold the

proceeding, and to vote to do so, the corrective proceeding the Board alone may convene, these are administrative and executive acts and omissions, not judicial determinations rendered after notice and hearing. The Defendants may not claim the immunity of adjudicators for refusing to adjudicate, nor the protection of a judicial process they withheld.

349. As a direct and proximate result of the individual Defendants' conduct, Dr. Doe has suffered the injuries set forth in paragraphs 191 through 195: the loss of his profession and his income over more than nineteen years; the loss of his board certification and professional standing; the destruction of contractual and practice opportunities; the costs and legal expense the deprivation forced upon him; the loss, for years, of his relationships with his children; and severe and continuing emotional and reputational harm. The individual Defendants are jointly and severally liable for these compensatory damages, including for the emotional distress their conduct caused.

350. The individual Defendants' conduct was undertaken with knowledge that no felony conviction existed and that their characterizations of Dr. Doe were false, and with evil motive or intent, or at the least with reckless and callous indifference to Dr. Doe's clearly established federal rights. They suspended him on a predicate they knew to be absent; they barred him from proving it absent; they coerced and then weaponized his private records; they reported him falsely at the moment he sought judicial relief; they advanced contradictory positions in successive tribunals to defeat his every attempt to be heard; and they refused, for more than nineteen years, to convene the committee and hold the one proceeding that could end the deprivation. Such conduct warrants an award of punitive damages against the individual Defendants. See *Smith v. Wade*, 461 U.S. 30 (1983).

351. Dr. Doe is therefore entitled to recover from the individual Defendants, in their individual capacities, compensatory damages in an amount to be proven at trial; punitive damages in an

amount sufficient to punish and to deter; and his reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, together with the further relief set forth in the Prayer.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff John Doe, M.D., respectfully requests that this Court enter judgment in his favor and against the Defendants and grant the following relief:

### I. DECLARATORY RELIEF

1. A declaration, pursuant to 28 U.S.C. §§ 2201 and 2202, that the April 26, 2007 order of mandatory suspension, and each Board order, directive, report, and other action derived from it, was entered without statutory authority, is ultra vires, and is void ab initio;
2. A declaration that, because the 2007 order is void, every subsequent Board proceeding, order, directive, and report that rested upon it derived from a nullity and supplies no independent basis for Dr. Doe's continued suspension or for the characterizations published against him, and that no proceeding, order, or ruling has ever adjudicated the existence of the felony predicate on which the 2007 order recites that it rests, so that none supplies an independent basis for either;
3. A declaration that Virginia Code § 54.1-2409(A), as applied to Dr. Doe and to licensees suspended on a predicate that does not exist, violates the Due Process Clause of the Fourteenth Amendment and Article I, § 11 of the Constitution of Virginia;
4. A declaration that the Defendants' suspension and continued suspension of Dr. Doe's license, their publication and maintenance of the felony and impairment characterizations, their differential treatment of Dr. Doe, their obstruction of his access to the courts, and their refusal to accord full faith and credit to the judgments of the Colorado court violated, and continue to violate, Dr. Doe's rights under the Fourteenth Amendment, Article I, § 11 of the Constitution of Virginia, the Americans with

Disabilities Act, and the Rehabilitation Act (as to the Fourteenth Amendment and Article I, § 11, against the individual and official-capacity Defendants; as to the Americans with Disabilities Act and the Rehabilitation Act, against the Department and the Board);

## II. INJUNCTIVE AND CORRECTIVE RELIEF (AGAINST DEFENDANTS BROWN AND HARP IN THEIR OFFICIAL CAPACITIES, AND THEIR SUCCESSORS IN OFFICE)

1. An injunction directing Defendants Brown and Harp, within the authority of their respective offices, to take all steps necessary to cause the 2007 order, and every order, directive, report, or action derived from it, to be given no further effect, and to cease treating any proceeding that rested upon it as a basis for Dr. Doe's suspension or for the characterizations published against him;
2. An injunction directing Defendants Brown and Harp, within the authority of their respective offices, to take all steps necessary to cause Dr. Doe's license to be restored to full, active, and unrestricted status, without monitoring, testing, or other condition, including, as to Defendant Harp, placing the matter before the Board and convening the proceeding necessary to effect that restoration, this Court having determined the matter directly and not by remand to the Board (see Count VII and *Fetta*);
3. An injunction directing Defendants Brown and Harp, within the authority of their respective offices, to correct, withdraw, or rescind, and to cause to be corrected, withdrawn, or rescinded, the records, reports, and publications that perpetuate the void order's effect, including the report made to the National Practitioner Data Bank, any report or data furnished to the Federation of State Medical Boards or to any other licensing, credentialing, or data repository, and the Defendants' own records and responses to inquiries concerning Dr. Doe;
4. An injunction directing Defendants Brown and Harp, within the authority of their respective offices, to accord full faith and credit to the October 9, 2019 sealing order of

the Colorado court and to the dismissal of the underlying charge, to take all steps necessary to conform their records, reports, disclosures, and the publications within their control to that order, to sequester the sealed information and decline to disclose it on inquiry consistent with that order, and to join or file, in any proceeding in which they are parties, motions to seal, redact, or substitute a pseudonym for Dr. Doe's identity in any opinion, order, or record that publishes the void characterizations;

5. An injunction directing Defendants Brown and Harp, within the authority of their respective offices, to issue, upon Dr. Doe's request, written verification to any government, licensing, or credentialing authority, immigration authority, employer, organization, or other entity that Dr. Doe's status with the Board and the Department is in good standing, that the 2007 order and the orders, directives, reports, and characterizations derived from it have been adjudged void ab initio and of no legal effect, and that no residual statement, report, or publication reciting the void characterizations carries any official validity, in a form suitable for submission to authorities within and outside the United States;

6. An injunction directing Defendants Brown and Harp, within the authority of their respective offices, to provide, and to take the steps necessary to cause to be provided, the verifications and confirmations of good standing necessary to facilitate Dr. Doe's restoration of his American Board of Obstetrics and Gynecology certification and any other professional credential lost as a consequence of the unlawful suspension, and not to oppose such restoration; and, upon Dr. Doe's request, to furnish a certified statement that the void records and characterizations have been sealed, corrected, or adjudged void, in a form Dr. Doe may submit in any proceeding in which those records or characterizations are at issue, and prohibiting the Defendants from opposing or undermining the sealing or redaction of their own void records wherever those records appear;

7. An injunction directing Defendants Brown and Harp, within the authority of their respective offices, to cooperate in good faith with, and not to impede, oppose, or penalize, any clinical reentry, retraining, proctoring, or credentialing process Dr. Doe elects to undertake in connection with his return to practice, including by timely furnishing to any hospital, insurer, credentialing body, or training program the verifications, records, and confirmations of good standing such a process requires, and prohibiting those Defendants from relying on the interval of non-practice caused by the void order as a basis to deny, delay, or condition the relief ordered herein;
8. An order providing that the foregoing declaratory and corrective relief be granted by this Court directly, and not by remand to the Board, the determinations to be carried out by Defendants Brown and Harp, within the authority of their respective offices, including by Defendant Harp's placing the matter before and convening the Board as necessary to effect the relief ordered.

## III. DAMAGES

1. Compensatory and consequential damages against the individual Defendants, in their individual capacities, in an amount to be proven at trial, for the injuries set forth in this Complaint, including lost income and professional opportunity, lost contractual and practice opportunities, the costs and legal expense the deprivation forced upon Dr. Doe, the loss of his board certification and professional standing, the loss of his relationships with his children, loss of property (physical and intellectual), and his emotional and reputational harm;
2. Compensatory and consequential damages for Dr. Doe's pecuniary losses, including his lost income, his lost professional opportunity, the loss of his personal and professional property, and the costs and expenses the discrimination forced upon him, against the Department of Health Professions and the Board of Medicine under Title II of the

Americans with Disabilities Act and Section 504 of the Rehabilitation Act, in an amount to be proven at trial;

3. Punitive damages against the individual Defendants, in their individual capacities, in an amount sufficient to punish and to deter;

## IV. FEES, COSTS, INTEREST, AND FURTHER RELIEF

1. Reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 12205, and 29 U.S.C. § 794a;
2. Pre-judgment and post-judgment interest as allowed by law;
3. A trial by jury on all claims so triable; and
4. Such other and further relief, at law or in equity, as this Court deems just and proper.

Respectfully submitted,

Dr. John Doe
By Counsel

_/s/ M. Paul Valois____

M. Paul Valois (VSB No. 72326)
James River Legal Associates
7601 Timberlake Road
Lynchburg, Virginia 24502
(434) 845-4529
mvalois@vbclegal.com
*Counsel for Plaintiff*